UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DEUTSCHE BANK NATIONAL TRUST,
AS TRUSTEE FOR IXIS 2006-HE3,
     Plaintiff,


v.                                          CIVIL ACTION NO.
                                            15-14155-MBB

JAMES P. MOYNIHAN and DURHAM
COMMERCIAL CAPITAL CORP.,
     Defendants.


**MEMORANDUM AND ORDER RE:**
**DEFENDANT JAMES P. MOYNIHAN'S MOTION TO DISMISS FOR LACK OF**
**SUBJECT MATTER JURISDICTION (DOCKET ENTRY # 9); DEFENDANT**
**JAMES P. MOYNIHAN'S MOTION TO DISMISS FOR FAILURE TO STATE A**
**CLAIM (DOCKET ENTRY # 11)**

**July 28, 2016**

**BOWLER, U.S.M.J.**

Pending before this court are two motions to dismiss filed by defendant James P. Moynihan ("Moynihan"). Moynihan moves to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) ("Rule 12(b)(1)") on the basis of lack of subject matter jurisdiction. (Docket Entry # 9). Moynihan also moves to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)") on the basis of failure to state a claim. (Docket Entry # 11). Plaintiff Deutsche Bank National Trust, as Trustee for IXIS 2006-HE3, ("plaintiff") opposes both motions. (Docket Entry ## 21, 25). Defendant Durham Commercial Capital Corp. ("Durham") did not join or oppose Moynihan's motions. After conducting a

hearing on April 22, 2016, this court took both motions under advisement.  (Docket Entry # 38).

## PROCEDURAL BACKGROUND

The parties' dispute arises out of a promissory note executed by Moynihan and secured by a mortgage on property in Lowell, Massachusetts, where Moynihan resides ("the property"). (Docket Entry # 1).  Plaintiff filed this action on December 16, 2015 to establish the terms of the note.  (Docket Entry # 1). The complaint states that this court has original jurisdiction because there is complete diversity between plaintiff and Moynihan and Durham ("defendants") and the amount in controversy is more than $75,000 because the outstanding balance due on the note and the mortgage from Moynihan to plaintiff exceeds $688,000.  (Docket Entry # 1, ¶ 4).

The complaint sets out two counts against defendants. (Docket Entry # 1, p. 8).  Count I requests a declaratory judgment in favor of plaintiff against both Durham and Moynihan establishing that plaintiff rightfully owns the note and is "entitled to immediate physical possession of the original [of the note]."  (Docket Entry # 1, ¶ 40).  Count II requests a declaratory judgment in favor of plaintiff against Moynihan establishing that plaintiff, under section one of Massachusetts General Laws chapter 231A and section 3-301(iii) of Massachusetts General Laws chapter 106 ("chapter 106"), is

2

entitled to enforce the terms of the note and the mortgage granting plaintiff a security interest in the property and may exercise the "default remedies provided for in the mortgage including exercise of the statutory power of sale." (Docket Entry # 1, ¶ 45).

Moynihan moves for dismissal of the complaint for lack of subject matter jurisdiction due to the absence of the $75,000 threshold and for failure to state a claim upon which relief can be granted. (Docket Entry ## 9, 11). Conversely, plaintiff contends that Moynihan's motion should be denied because the facts establish the necessary $75,000 and the complaint includes factual allegations that demonstrate a plausible claim to relief. (Docket Entry ## 21, 25).

I. Rule 12(b)(1) Motion to Dismiss

STANDARD OF REVIEW

Where, as here, a district court considers a Fed.R.Civ.P. 12(b)(1) ("Rule 12(b)(1)") motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor. Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010) (citing Valentin v. Hospital Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001)); Sánchez ex rel. D.R.-S. v. United States, 671 F.3d 86, 92 (1st Cir. 2012) ("'credit[ing] the plaintiff's well-pled factual allegations and draw[ing] all reasonable inferences in the

3

plaintiff's favor'" under Rule 12(b)(1) (internal citation omitted)).  "The district court may also 'consider whatever evidence has been submitted, such as the depositions and exhibits submitted.'"  Merlonghi v. United States, 620 F.3d at 54 (quoting Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996)).

Moreover, "'Federal courts are courts of limited jurisdiction'" and "[t]he existence of subject-matter jurisdiction [is therefore] 'never presumed.'"  Fafel v. Dipaola, 399 F.3d 403, 410 (1st Cir. 2005) (internal citations omitted).  When a defendant challenges subject matter jurisdiction, the plaintiff bears the burden of proving jurisdiction.  Johansen v. United States, 506 F.3d 65, 68 (1st Cir. 2007).

Rule 12(b)(1) is "[t]he proper vehicle for challenging a court's subject matter jurisdiction."  Valentin v. Hospital Bella Vista, 254 F.3d at 362.  Because federal courts are courts of limited jurisdiction, federal jurisdiction is never presumed.  See Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998).  "A court should treat all well pleaded facts as true and provide plaintiff the benefit of all reasonable inferences."  Lindsay v. Wells Fargo Bank, N.A., 2013 WL 5010977, at *2 (D.Mass. Sept. 11, 2013) (citing Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009)).  Dismissal is only appropriate when the facts

alleged in the complaint, taken as true, do not support a finding of federal subject matter jurisdiction.  Fothergill v. United States, 566 F.3d at 251.  Adhering with this framework, the record sets out the following facts.

FACTUAL BACKGROUND

In a deed dated August 28, 2003 and recorded at the Middlesex North Registry of Deeds in book 16104, page 44, Moynihan acquired the property located at 619-621 Stevens Street in Lowell.  (Docket Entry # 1, ¶ 6).  Moynihan, as borrower, gave the promissory note to New Century Mortgage Corporation ("New Century"), as lender, in the original principal amount of $360,000 dated May 1, 2006.  (Docket Entry # 1, ¶ 7) (Docket Entry # 1-3) (Docket Entry # 24, ¶ 6).  The note bore a single indorsement payable "to the order of" New Century "without recourse."  (Docket Entry # 1, ¶ 8) (Docket Entry # 1-3) (Docket Entry # 24, ¶ 6).  Moynihan was the only borrower on the note. (Docket Entry # 1-3).  The note expressly allows "the Lender" to transfer the note and states that, "The Lender or anyone who takes [the note] by transfer and who is entitled to receive payments under [the note] is called the 'Note Holder.'"  (Docket Entry # 1-3).

Moynihan agreed to make monthly payments of $2,703.90 on the first day of each month starting on June 1, 2006.  (Docket Entry # 1-3).  The note also warranted that the monthly payments

applied to interest before principal.  (Docket Entry # 1-3).
The note further contained a flexible index-based interest rate
that adjusted every six months after the first day of May 2008.
(Docket Entry # 1-3).  The interest rate on the principal in the
note would range between 9.013% and 10.513% at the first
adjustment date and would not drop below 9.013% nor exceed
16.013%.  (Docket Entry # 1-3).  The note also represented that
Moynihan would default if he failed to make his monthly payments
in full.  (Docket Entry # 1-3).  As stated in the note, the
"Note Holder may enforce its rights under this [n]ote against
each [borrower] individually or against all of [the borrowers]
together."  (Docket Entry # 1-3).  The note was "governed by
federal law and the law of the jurisdiction in which the
property encumbered by the Security Instrument . . . [was]
located."  (Docket Entry # 1-3).

On May 1, 2006, to secure the repayment and other
obligations contained in the note, Moynihan granted a mortgage
encumbering the property to New Century.  (Docket Entry # 1, ¶
10) (Docket Entry # 1-4).  The mortgage is recorded at the
Middlesex North Registry of Deeds in book 20067, page 159.
(Docket Entry # 1, ¶ 10) (Docket Entry # 1-4).  The mortgage
provides notice to Moynihan that "one or more changes of the
Loan Servicer [might occur] unrelated to a sale of the [note]"
during the life of the mortgage.  (Docket Entry # 1-4, ¶ 20).

Under the terms of the mortgage, Moynihan conveyed and granted New Century and its "successors and assigns" the "power of sale." (Docket Entry # 1-4, pp. 4, 14).[1]

Plaintiff acquired physical possession of the original of the note on or about May 12, 2006. (Docket Entry # 1, ¶ 9). Thereafter, New Century sold the note to NC Capital Corporation ("NC Capital") under a Mortgage Loan Purchase and Servicing Agreement ("MLPSA") dated as of December 1, 1998. (Docket Entry # 1, ¶ 11).[2] NC Capital then sold the note to IXIS Real Estate Capital, Inc. ("IXIS") under a Third Amended and Restated Mortgage Loan Purchase and Warranties Agreement dated April 1, 2006. (Docket Entry # 1, ¶ 12).[3] IXIS then sold the note to Morgan Stanley ABS Capital I Inc. ("Morgan Stanley") effective September 29, 2006. (Docket Entry # 1, ¶ 13).[4]

Morgan Stanley then sold the note to plaintiff, as trustee and custodian, pursuant to a pooling and servicing agreement establishing IXIS Real Estate Capital Trust 2006-HE ("the PSA") dated September 1, 2006 and effective September 29, 2006.

---

[1] Page numbers refer to the page as docketed as opposed to the page number of the document itself.

[2] The complaint states that New Century sold "the loan" to NC Capital. (Docket Entry # 1, ¶ 11). This court reasonably infers that the reference to "the loan" refers to the note as opposed to the mortgage because the complaint attaches an assignment of the mortgage by itself without the note from *New Century* directly to plaintiff dated November 11, 2008. (Docket Entry # 1-5).

[3] See the previous footnote.

[4] See footnote two.

(Docket Entry # 1, ¶ 14).[5]  The PSA also established Saxon

Mortgage Services, Inc. ("Saxon") as a loan servicer.  (Docket

Entry # 1, ¶ 14).

Before January 1, 2008, Moynihan defaulted on his monthly

payments.  (Docket Entry # 24, ¶ 11) (Docket Entry # 24-2).  On

June 23, 2008, Moynihan filed for bankruptcy in the United

States Bankruptcy Court for the District of Massachusetts ("the

bankruptcy court").  (Docket Entry # 1, ¶ 19).  On October 7,

2008, the bankruptcy court granted Moynihan a chapter seven

discharge.  (Docket Entry # 1, ¶ 19) (Docket Entry # 10-1).

In the assignment dated November 11, 2008 and effective May

7, 2008, New Century transferred the mortgage to plaintiff, as

trustee, in care of Saxon as servicer.  (Docket Entry # 1, ¶ 15)

(Docket Entry # 1-5, p. 2) (Docket Entry # 24, ¶ 8).  The

assignment was recorded at the Middlesex North Registry of Deeds

in book 22959, page 228.  (Docket Entry # 1, ¶ 15) (Docket Entry

# 1-5).

Effective April 16, 2010, Ocwen Loan Servicing, LLC

("Ocwen") obtained the servicing rights on the loan from Saxon.

(Docket Entry # 24, ¶ 10) (Docket Entry # 24-1).  Ocwen's

obligations as plaintiff's servicer included:

> sending statements or coupons to the borrower to facilitate
> payment, collecting payments from the borrower and making
> scheduled disbursements of principal and interest to

---

[5]  See footnote two.

accounts making disbursements from such account[s] to pay
real estate taxes and or hazard insurance premiums due in
connection with the [p]roperty and to perform other usual
and customary residential loan servicing functions.

(Docket Entry # 24, ¶ 3).  In a document dated May 21, 2010,

plaintiff granted a limited power of attorney ("the LPOA") to

Ocwen.  (Docket Entry # 21-2).  The LPOA was recorded at the

Middlesex North Registry of Deeds in book 25043, page 286.

(Docket Entry # 21-2).  The LPOA authorized Ocwen to execute

various documents on behalf of plaintiff regarding foreclosure

proceeding for loans held by plaintiff.  (Docket Entry # 21-2).

On August 16, 2010, Moynihan filed a complaint in the

Massachusetts Land Court Department of the Trial Court ("the

land court") seeking a determination that plaintiff did not hold

the mortgage encumbering the property.  (Docket Entry # 1, ¶ 16)

(Docket Entry # 1-6).  During this proceeding, Ablitt Scofield,

P.C. ("Ablitt"), a law firm located in Woburn, Massachusetts,

represented plaintiff.  (Docket Entry # 21-1, p. 5) (Docket

Entry # 10-2, p. 2).

On or about July 20, 2011, plaintiff temporarily gave the

original of the note to Ocwen "to facilitate Ocwen's . . .

foreclosure of the mortgage on behalf of plaintiff." (Docket

Entry # 1, ¶ 20).  On or about August 16, 2011, Ocwen returned

the file, which contained the original of the note, to

plaintiff.  (Docket Entry # 1, ¶ 21).  On October 18, 2011,

plaintiff again temporarily gave the file, which included the original of the note, to Ocwen to facilitate conducting the foreclosure of the property.  (Docket Entry # 1, ¶ 22).  On or about November 21, 2011, Ocwen gave the original of the note to Ablitt to commence and proceed with foreclosure of the property. (Docket Entry # 1, ¶ 23).  Plaintiff alleges that it possessed "the original Note directly or indirectly through its attorney, agent and/or custodian and [is] entitled to enforce the terms of such Note, when, at some point . . . [after] Ocwen transmitted the original note to Ablitt . . . in November 2011, loss of possession of the note occurred."  (Docket Entry # 1, ¶ 42).

On December 30, 2011, the land court entered a judgment that, by virtue of the November 2008 assignment of the mortgage, plaintiff was "the current record holder of the Mortgage, entitled to exercise the power of sale contained in the Mortgage."  (Docket Entry # 1-6).  The judgment also declared that plaintiff "may exercise the power of sale contained in the Mortgage to foreclose it without regard to whether or not plaintiff is the current holder of the Note."[6] (Docket Entry # 1-6).  Neither plaintiff nor Moynihan filed an appeal in of the land court's judgment.  (Docket Entry # 1, ¶ 17).

---

[6] The judgment pre-dates the 2012 decision in <u>Eaton v. Fed. Nat'l Mortg. Ass'n</u>, 969 N.E.2d 1118, 1124 (Mass. 2012).

Sometime in 2012 or earlier, Ablitt began having cash-flow issues. (Docket Entry # 1, ¶ 24). On or about November 7, 2012, Ablitt entered into a factoring agreement titled "Nonrecourse Receivables Purchase Contract and Security Agreement" ("the factoring agreement") with Durham. (Docket Entry # 1, ¶ 25). Under the factoring agreement, Durham agreed to purchase "certain of [Ablitt]'s receivables at terms specified therein up to a maximum advance for such receivables at any given time of $1,200,000." (Docket Entry # 1, ¶ 25). In the factoring agreement, Ablitt also gave Durham a security interest in Ablitt's accounts, "'promissory notes, chattel paper' . . . [and] 'general intangibles.'" (Docket Entry # 1, ¶ 27). The security interest also included "custody and control over [Ablitt]'s assets, files, records, electronically stored data, hard drives and/or case management systems, not otherwise identified and retrieved by [Ablitt]'s former clients." (Docket Entry # 1, ¶ 35). Ablitt continued to deteriorate in 2013 and early 2014. (Docket Entry # 1, ¶ 28). As a result, Durham "began to exert a level of managerial control over [Ablitt's] affairs." (Docket Entry # 1, ¶ 28).

On or about March 4, 2014, Ablitt changed its name to Connolly, Geaney, Ablitt and Willard, P.C. ("CGAW"). (Docket Entry # 1, ¶ 29). Sometime in late July or August 2014, CGAW ceased operations. (Docket Entry # 1, ¶ 30). In August 2014,

Ocwen's personnel visited CGAW's office to collect Ocwen's "on-going foreclosure, eviction, bankruptcy and litigation files" then held by CGAW.  (Docket Entry # 1, ¶ 31).  On or about September 3, 2014, three or more creditors of CWAG filed on CWAG's behalf "[a]n involuntary chapter 7 bankruptcy petition" in the bankruptcy court.  (Docket Entry # 1, ¶ 32).  CGAW never returned the original of the note to plaintiff or Ocwen.  (Docket Entry # 1, ¶ 33).  "Despite [a] diligent search," plaintiff and Ocwen have not been able to locate the original note.  (Docket Entry # 33).  Neither plaintiff nor Ocwen know the present location of the original of the note. (Docket Entry # 1, ¶¶ 33-34).  Plaintiff believes that the missing original of the note "is amongst the assets, files and/or records obtained and retained by Durham at or about the time [CGAW] ceased active operations."  (Docket Entry # 1, ¶ 36).

In November 2014, Ocwen obtained an estimated fair market valuation of the property of $264,000.  (Docket Entry # 24, ¶ 13) (Docket Entry # 24-3).  In December 2015, Ocwen obtained an estimated fair market valuation of the property of $268,000.  (Docket Entry # 24, ¶ 14) (Docket Entry # 24-4).  As of February 25, 2016, the property had an assessed valuation of $282,900.  (Docket Entry # 10-3).

The "mortgage account with Ocwen is now due for the January 1, 2008 payment together with all subsequently accrued but

unpaid installments." (Docket Entry # 24, ¶ 11) (Docket Entry # 24-2). The principal balance due is $359,944.32. (Docket Entry # 24, ¶ 12) (Docket Entry # 24-2). This amount does not include "accrued interest, late charges, escrow advances, attorney's fees and other charges assessed to the account in accordance with the terms and conditions of the [note] and [mortgage]." (Docket Entry # 24, ¶ 12) (Docket Entry # 24-2). Plaintiff now seeks to foreclose the mortgage "pursuant to the power of sale contained therein but cannot until the terms of the lost note and [p]laintiff's ownership thereof are established." (Docket Entry # 1, ¶ 18).

DISCUSSION

Moynihan moves to dismiss both counts in the complaint on the basis that plaintiff failed to allege enough facts to meet the amount in controversy of $75,000. (Docket Entry # 9). Plaintiff opposes dismissal submitting that it pled enough facts to establish the amount in controversy. (Docket Entry # 23).

Diversity jurisdiction has two components: (1) a dispute between citizens of different states; and (2) an amount in controversy in excess of $75,000. 28 U.S.C. § 1332. Moynihan has not challenged the citizenship of the parties and this court is satisfied that the parties are diverse in terms of citizenship as defined under 28 U.S.C. § 1332. The dispositive issue is therefore the amount in controversy requirement.

A.  Whether the Claims have Underlying Monetary Value

In light of Moynihan's challenge to the amount in
controversy, plaintiff bears "the burden to establish that the
minimum amount in controversy has been met." Abdel-Aleem v. OPK
Biotech LLC, 665 F.3d 38, 41 (1st Cir. 2012); Spielman v. Genzyme
Corp., 251 F.3d 1, 4 (1st Cir. 2001) ("as the party seeking to
invoke jurisdiction, Spielman has the burden of showing that he
has met the statutory requirements").  A plaintiff's general
allegation in the complaint "suffices unless questioned by the
opposing party." Id. at 5.  Where, however, the defendant
challenges the amount, "'the party seeking to invoke
jurisdiction [here, plaintiff] has the burden of alleging with
sufficient particularity facts indicating that it is not a legal
certainty that the claim involves less than the jurisdictional
amount.'"  Id. at 5; accord Stewart v. Tupperware Corp., 356
F.3d 335, 338 (1st Cir. 2004) (because "plaintiffs seek to invoke
federal diversity jurisdiction, they have the burden of showing
that their claims meet the amount-in-controversy requirement").
A court may weigh the evidence to find the facts of a case, as
long the court avoids going into the merits of the dispute.  See
Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006).

In a declaratory judgment action where plaintiff relies on
diversity jurisdiction, the amount in controversy "is the value
of the right or the viability of the legal claim to be declared,

such as a right to indemnification or a duty to defend." C.E.
Design Ltd. V. Am. Econ. Ins. Co., 755 F.3d 39, 43 (1st Cir.
2014); accord Bedard v. Mortg. Elec. Registration Sys., Inc.,
2011 WL 1792738, at *2 (D.N.H. May 11, 2011) (characterizing
value of right or viability of legal claim as determining the
"value of the object of the litigation").  More particularly,
"'When the validity of a contract or a right to property is
called into question in its entirety, the value of the property
controls the amount in controversy.'"  Nationstar Mortg. LLC v.
Knox, 2009 WL 2605356, at *3 (5th Cir. Aug. 25, 2009).
Furthermore, "in a case seeking equitable relief against a
foreclosure sale, the fair market value of the property is an
acceptable measure of the amount in controversy for purposes of
diversity jurisdiction."  Bedard v. Mortg. Elec. Registration
Sys., Inc., 2011 WL 1792738, at *3.

In the case at bar, plaintiff seeks a declaratory judgment
in favor of plaintiff for ownership of the note in order to
enforce the terms of the note and the mortgage, which include
foreclosure and the statutory power of sale of the property.
(Docket Entry # 1, ¶¶ 40, 45).  The underlying value of the
right is not mere possession but rather the right to enforce the
power of sale that would render plaintiff a monetary sum derived
from the property's value.  Consistent with Bedard and
Nationstar, the property's value provides the appropriate

15

measure for the amount in controversy.  See Nationstar Mortg. LLC v. Knox, 2009 WL 2605356, at *3; Bedard v. Mortg. Elec. Registration Sys., Inc., 2011 WL 1792738, at *2-3.

Moynihan, in opposing the monetary value of plaintiff's claims, relies on a series of cases that do not directly apply in the case at bar.  Moynihan maintains that the object of the litigation is not the value of the property but rather the right to begin a foreclosure proceeding for mere possession of the property.  (Docket Entry # 10, ¶ IV(B)); see PHH Mortg. Corp. v. Lanou, 2015 WL 162911, at *3 (D.Mass. Jan. 13, 2015) (noting that "where Plaintiff merely seeks possession of property it already owns as well as incidental damages stemming therefrom, courts have held that the amount in controversy is not the value of the property.").  The holding in Lanou, however, does not apply here because plaintiff does not currently own the property and the value of the underlying right that plaintiff seeks is not simply a right of possession but a series of rights that would allow plaintiff to recover a monetary sum that meets the amount in controversy requirement.

Moynihan next asserts that a number of courts have reasoned that "where a mortgagor 'is not challenging the validity' of the loan or mortgage but 'merely disputes that defendants are the ones having the right to enforce those documents,' using the value of the property as the amount in controversy is not

16

appropriate.'"   Bedard v. Mortgage Elec. Registration Sys., Inc., 2011 WL 1792738, at *3 & n.2 (noting that many courts have found "the fair market value of the property [as] an acceptable measure of the amount in controversy for purposes of diversity jurisdiction" and applying that standard to court's holding, but also citing, as a lone counter-example, holding in Ballew v. America's Servicing Co., 2011 WL 880135, at *5 (N.D. Tex. March 14, 2011)).   The Ballew decision is distinguishable because the plaintiff in Ballew was the mortgagor, who merely sought an injunctive order preventing the defendant mortgagee from *taking possession* of the property *already owned* by the defendant.   See id. at *1.   In the case at bar, plaintiff is the mortgagee seeking to establish ownership of the note to foreclose on the property and sell the property for a monetary sum.   Here, as discussed below, plaintiff provides sufficient facts regarding the value of the property showing that it is not a legal certainty that the claims involve less than the $75,000 jurisdictional amount.

B.   Amount in Controversy

      The amount in controversy requirement of diversity jurisdiction turns on whether it appears "'to a legal certainty that the claim is really for less than the jurisdictional amount.'"   Spielman v. Genzyme Corp., 251 F.3d at 5 (internal citation omitted).   Plaintiff must make a good faith proffer of

any amount that meets the $75,000 minimum.  See generally Abdel-Aleem v. OPK Biotech LLC, 665 F.3d at 41.  Moreover, in a similar enforcement action involving a note and a deed on a property where the amount in controversy was challenged, the court held that the value of the underlying interest in a note worth $350,000 and a deed on a property valued at $300,000 met the amount in controversy of $75,000.  See Hien Pham v. Bank of New York, 856 F.Supp.2d 804, 810-11 (E.D.Va. 2012) (determining that object of litigation was mortgagee's interest in note and deed securing interest in property and property greatly exceeded $75,000 in value).

In the case at bar, plaintiff submitted sufficient evidence that satisfies the amount in controversy such that it cannot be proven with legal certainty that the amount in controversy is below $75,000.  Moynihan, however, points out that the bankruptcy renders the note uncollectable and worthless and the mortgage provides only an in rem right to payment.  Even if plaintiff cannot ultimately claim the value of the underlying debt *from the note* due to Moynihan's bankruptcy, the mortgage survived the bankruptcy proceeding and retains an underlying value potentially measured by the proceeds from a sale of the property.  Plaintiff has a right "to repossession or obtaining an amount of money reflecting the value of the collateral" and this right takes the form of the "'right to the proceeds from

18

the sale of the [] property.'"  Arruda v. Sears, Roebuck & Co.,
310 F.3d 13, 22 (1st Cir. 2002) (internal citation omitted).
Moynihan correctly asserts that plaintiff needs to establish the
likelihood of receiving $75,000 in proceeds from a foreclosure
sale.  (Docket Entry # 10, p. 5).  Plaintiff has provided
valuations and assessments in the record, however, that show the
present value of the property as well over $75,000.  The
December 2014 appraisal valued the property at $264,000.
(Docket Entry # 24, ¶ 13) (Docket Entry # 24-3).  The December
2015 appraised value of the property is $268,000.  (Docket Entry
# 24, ¶ 14) (Docket Entry # 24-4).  As of February 25, 2016, the
city of Lowell assessed the property at $282,900.  (Docket Entry
# 10-3).  When considering plaintiff's incurred costs of selling
of the property and their effect on the proceeds, the proceeds
are highly unlikely to fall below $75,000 from the $264,000 to
$282,000 range of values established by the appraisals and
assessments.  Therefore, plaintiff established that it is not a
legal certainty that the amount in controversy involves less
than $75,000.  Indeed, with respect to both counts, plaintiff
alleges a claim that meets the jurisdictional requirements of
diversity among parties and an amount in controversy of over
$75,000.  The complaint therefore survives the Rule 12(b)(1)
motion to dismiss.

II.  Rule 12(b)(6) Motion to Dismiss

STANDARD OF REVIEW

The standard of review for a Rule 12(b)(6) motion is well established.  To survive a Rule 12(b)(6) motion to dismiss, the complaint must include factual allegations that when taken as true demonstrate a plausible claim to relief even if actual proof of the facts is improbable.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-58 (2007).  Thus, while "not equivalent to a probability requirement, the plausibility standard asks for more than a sheer possibility that a defendant has acted unlawfully."  Boroian v. Mueller, 616 F.3d 60, 65 (1st Cir. 2010) (internal quotation marks and internal citations omitted).  "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not shown that the pleader is entitled to relief."  Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 533 (1st Cir. 2011) (internal quotation marks, brackets and citations omitted).  Discarding legal conclusions and taking the facts in the governing complaint as "true and read in a plaintiff's favor" even if seemingly incredible, the complaint "must state a plausible, but not a merely conceivable, case for relief."  Sepúlveda-Villarini v. Dept. of Educ. of Puerto Rico, 628 F.3d 25, 29-30 (1st Cir. 2010).

In reviewing a complaint, a court considers the complaint

and any documents attached to it.  Fed.R.Civ.P. 10(c) ("an
exhibit to a pleading is part of the pleading for all
purposes").  The lease attached to the complaint is therefore
part of the Rule 12(b)(6) record.  In evaluating a Rule 12(b)(6)
motion, the court may also consider a limited category of
documents outside the complaint without converting the motion
into one for summary judgment.  Such documents include public
records and documents sufficiently referred to in the complaint.
See Butler v. Balolia, 736 F.3d 609, 611 (1st Cir. 2013)
(supplementing facts in complaint "by examining 'documents
incorporated by reference into the complaint, matters of public
record, and facts susceptible to judicial notice'") (internal
citation omitted); Freeman v. Town of Hudson, 714 F.3d 29, 36
(1st Cir. 2013) (court may consider "'official public records;
documents central to plaintiffs' claim; and documents
sufficiently referred to in the complaint'") (ellipses, internal
brackets and citation omitted).

## FACTUAL BACKGROUND[7]

In a deed dated August 28, 2003 and recorded at the
Middlesex North Registry of Deeds in book 16104, page 44,
Moynihan acquired the property located at 619-621 Stevens Street
in Lowell.  (Docket Entry # 1, ¶ 6).  Moynihan, as borrower,

---

[7]  The facts in the Rule 12(b)(6) record are similar to the facts
in the Rule 12(b)(1) record.

gave the promissory note to New Century, as lender, in the
original principal amount of $360,000 dated May 1, 2006.
(Docket Entry # 1, ¶ 7) (Docket Entry # 1-3).  The note bore a
single indorsement payable "to the order of" New Century
"without recourse."  (Docket Entry # 1, ¶ 8) (Docket Entry # 1-
3).  Moynihan was the only borrower on the note.  (Docket Entry
# 1-3).  The note expressly allows "the Lender" to transfer the
note and states that, "The Lender or anyone who takes [the note]
by transfer and who is entitled to receive payments under [the
note] is called the 'Note Holder.'"  (Docket Entry # 1-3).

Moynihan agreed to make monthly payments of $2,703.90 on
the first day of each month starting on June 1, 2006.  (Docket
Entry # 1-3).  The note also warranted that the monthly payments
applied to interest before principal.  (Docket Entry # 1-3).
The note also represented that Moynihan would default if he
failed to make his monthly payments in full.  (Docket Entry # 1-
3).  As stated in the note, the "Note Holder may enforce its
rights under this [n]ote against each [borrower] individually or
against all of [the borrowers] together."  (Docket Entry # 1-3).

On May 1, 2006, to secure the repayment and other
obligations contained in the note, Moynihan granted the mortgage
encumbering the property to New Century.  (Docket Entry # 1, ¶
10) (Docket Entry # 1-4).  The mortgage is recorded at the
Middlesex North Registry of Deeds in book 20067, page 159.

(Docket Entry # 1, ¶ 10) (Docket Entry # 1-4).  The mortgage provides notice to Moynihan that "one or more changes of the Loan Servicer [might occur] unrelated to a sale of the [note]" during the life of the mortgage.  (Docket Entry # 1-4, ¶ 20).  Under the terms of the mortgage, Moynihan conveyed and granted New Century and its "successors and assigns" the "power of sale."  (Docket Entry # 1-4, pp. 4, 14).

Plaintiff acquired physical possession of the original of the note on or about May 12, 2006.  (Docket Entry # 1, ¶ 9) (Docket Entry # 21, p. 2).  Thereafter, New Century sold the note to NC Capital under the MLPSA dated December 1, 1998.  (Docket Entry # 1, ¶ 11).[8]  NC Capital then sold the loan to IXIS under the Third Amended and Restated Mortgage Loan Purchase and Warranties Agreement dated April 1, 2006.  (Docket Entry # 1, ¶ 12).[9]  IXIS then sold the note to Morgan Stanley effective September 29, 2006.  (Docket Entry # 1, ¶ 13).[10]  Morgan Stanley then sold the note to plaintiff, as trustee and custodian, pursuant to the PSA dated September 1, 2006 and effective September 29, 2006.  (Docket Entry # 1, ¶ 14).[11]

On June 23, 2008, Moynihan filed for bankruptcy in the

---

[8]  The complaint states that New Century sold "the loan" to NC Capital.  As explained in footnote two, this court reasonably infers that the reference to "the loan" refers to the note as opposed to the mortgage.
[9]  See footnote two.
[10]  See footnote two.
[11]  See footnote two.

bankruptcy court.  (Docket Entry # 1, ¶ 19).  On October 7, 2008, the bankruptcy court granted Moynihan the chapter seven discharge.  (Docket Entry # 1, ¶ 19) (Docket Entry # 10-1).

In the assignment dated November 11, 2008 and effective May 7, 2008, New Century transferred the mortgage to plaintiff, as trustee, in care of Saxon as servicer.  (Docket Entry # 1, ¶ 15) (Docket Entry # 1-5, p. 2).  The assignment was recorded at the Middlesex North Registry of Deeds in book 22959, page 228. (Docket Entry # 1, ¶ 15) (Docket Entry # 1-5).

On May 21, 2010, plaintiff granted the LPOA to Ocwen. (Docket Entry # 21-2).  The LPOA was recorded at the Middlesex North Registry of Deeds in book 25043, page 286.  (Docket Entry # 21-2).  The LPOA authorized Ocwen to execute various documents on behalf of plaintiff regarding foreclosure proceedings for loans held by plaintiff.  (Docket Entry # 21-2).

On August 16, 2010, Moynihan filed the complaint in the land court seeking to determine that plaintiff did not hold the mortgage encumbering the property.  (Docket Entry # 1, ¶ 16) (Docket Entry # 1-6).  During this proceeding, Ablitt represented plaintiff.  (Docket Entry # 21-1, p. 5).

On or about July 20, 2011, plaintiff temporarily gave the original of the note to Ocwen "to facilitate Ocwen's . . . foreclosure of the mortgage on behalf of plaintiff." (Docket Entry # 1, ¶ 20).  On or about August 16, 2011, Ocwen returned

the file, which contained the original of the note, to plaintiff.  (Docket Entry # 1, ¶ 21).  On October 18, 2011, plaintiff again temporarily gave the file, which included the original of the note, to Ocwen to prosecute a foreclosure of the mortgage on behalf of plaintiff.  (Docket Entry # 1, ¶ 22).  On or about November 21, 2011, Ocwen gave the original of the note to Ablitt to commence and proceed with a foreclosure of the property on behalf of plaintiff.  (Docket Entry # 1, ¶ 23).  Plaintiff alleges that it possessed "the original Note directly or indirectly through its attorney, agent and/or custodian and [is] entitled to enforce the terms of such Note, when, at some point . . . [after] Ocwen transmitted the original note to Ablitt in November 2011, loss of possession of the note occurred."  (Docket Entry # 1, ¶ 42).

On December 30, 2011, the land court entered the judgment that, "by virtue of the [November 2008] assignment of the mortgage, plaintiff was the current record holder of the Mortgage, entitled to exercise the power of sale contained in the Mortgage."  (Docket Entry # 1-6).  The judgment declared that plaintiff "may exercise the power of sale contained in the Mortgage to foreclose it without regard to whether or not plaintiff is the current holder of the Note."[12]  (Docket Entry # 1-6).

---

[12]  See footnote six.

Sometime in 2012 or earlier, Ablitt began having cash-flow issues. (Docket Entry # 1, ¶ 24). On or about November 7, 2012, Ablitt entered into the factoring agreement with Durham. (Docket Entry # 1, ¶ 25). Under the factoring agreement, Durham agreed to purchase "certain of [Ablitt]'s receivables at terms specified therein up to a maximum advance for such receivables at any given time of $1,200,000." (Docket Entry # 1, ¶ 25). In the factoring agreement, Ablitt also gave Durham a security interest in Ablitt's accounts, "'promissory notes, chattel paper' . . . [and] 'general intangibles.'" (Docket Entry # 1, ¶ 27). The security interest also included "custody and control over [Ablitt]'s assets, files, records, electronically stored data, hard drives and/or case management systems, not otherwise identified and retrieved by [Ablitt]'s former clients." (Docket Entry # 1, ¶ 35). Ablitt continued to deteriorate in 2013 and early 2014. (Docket Entry # 1, ¶ 28). As a result, Durham "began to exert a level of managerial control over [Ablitt's] affairs." (Docket Entry # 1, ¶ 28).

On or about March 4, 2014, Ablitt changed its name to CGAW. (Docket Entry # 1, ¶ 29). Sometime in late July or August 2014, CGAW ceased operations. (Docket Entry # 1, ¶ 30). In August 2014, Ocwen's personnel visited CGAW's office to collect Ocwen's "on-going foreclosure, eviction, bankruptcy and litigation files" then held by CGAW. (Docket Entry # 1, ¶ 31). On or

about September 3, 2014, three or more creditors of CWAG filed on CWAG's behalf "[a]n involuntary chapter 7 bankruptcy petition" in the bankruptcy court.  (Docket Entry # 1, ¶ 32). CGAW never returned the original of the note to plaintiff or Ocwen.  (Docket Entry # 1, ¶ 33).  "Despite [a] diligent search," plaintiff and Ocwen have not been able to locate the original note.  (Docket Entry # 33).  Neither plaintiff nor Ocwen know the present location of the original of the note. (Docket Entry # 1, ¶¶ 33-34).  Plaintiff believes that the missing original of the note "is amongst the assets, files and/or records obtained and retained by Durham at or about the time [CGAW] ceased active operations."  (Docket Entry # 1, ¶ 36).

As of February 25, 2016, the property had an assessed valuation of $282,900.  (Docket Entry # 10-3).  Plaintiff now seeks to foreclose the mortgage "pursuant to the power of sale contained therein but cannot until the terms of the lost note and [p]laintiff's ownership thereof are established."  (Docket Entry # 1, ¶ 18).

## DISCUSSION

Moynihan seeks dismissal based on two arguments.  First, Moynihan submits that plaintiff did not "actually" possess the note at the time that the note was lost and that principles of agency do not apply to the governing statute, chapter 106,

27

section 3-309 ("section 3-309").  (Docket Entry ## 12, 36).

Second, even if agency applies, Moynihan submits that the loss

of possession by plaintiff was the result of a transfer of both

the note and the enforcement rights of the note to Ocwen.

(Docket Entry ## 12, 36).  Plaintiff contends that it possessed

the note through its agents, including its attorney (Ablitt) and

servicer (Ocwen).  (Docket Entry # 21).

I.   Actual Possession and Agency

Plaintiff alleges that it constructively possessed the note

through its agents at the time the note was lost.  Moynihan

contends that plaintiff fails to state a claim because plaintiff

did not "actually" possess the note at the time the note was

lost.

The note is governed by Massachusetts law.  (Docket Entry #

1-3).  In Massachusetts, a person may enforce a note if the

person is "(i) the holder of the [note], (ii) a nonholder in

possession of the [note] who has the rights of a holder, or

(iii) a person not in possession of the [note] who is entitled

to enforce the [note] pursuant to . . . 3-309."  Mass. Gen. L.

ch. 106, § 3-301.  Plaintiff has brought an action to establish

its ability to enforce the lost note given by Moynihan.  (Docket

Entry # 1).

Section 3-309 provides that:

A person not in possession of an instrument is entitled to

28

enforce the instrument if (i) the person was *in possession of the instrument* and *entitled to enforce it when loss of possession occurred*, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

Mass. Gen. L. ch. 106, § 3-309(a) (emphasis added).  Section 3-309 further requires that a person not in possession of an instrument and:

seeking enforcement of an instrument . . . must prove the terms of the instrument and the person's right to enforce the instrument.  If that proof is made, section 3-308 applies to the case as if the person seeking enforcement had produced the instrument.  The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument.  Adequate protection may be provided by any reasonable means.

Mass. Gen. L. ch. 106, § 3-309(b).

Section 3-309 governs the enforceability of a lost note under Massachusetts law.  See In re Harborhouse of Gloucester, LLC, 505 B.R. 365, 370 (Bankr.D.Mass. 2014), aff'd, 523 B.R. 749 (B.A.P. 1st Cir. 2014).  "The purpose of the possession requirement . . . is to protect the [d]ebtor from multiple enforcement claims to the same note."  Marks v. Braunstein, 439 B.R. 248, 251 (D.Mass. 2010) (citing In re Gavin, 319 B.R. 27, 33 (B.A.P. 1st Cir. 2004).  In addition to the specific provisions of section 3-309, section 1-103 of chapter 106 states

that, "Unless displaced by the particular provisions of [chapter 106], the principles of law and equity, including . . . the law relative to . . . principal and agent . . . supplement [chapter 106's] provisions."  Mass. Gen. L. ch. 106, § 1-103 ("section 1-103"); see also Terry v. Kemper Ins. Co., 456 N.E.2d 465, 467 (Mass. 1983) (applying common law principles of agency in insurance claim case where governing statute lacked specificity).  The "enactment of the U.C.C. in Massachusetts does not necessarily require us to ignore well-settled principles of agency law."  Terry v. Kemper Ins. Co., 456 N.E.2d at 467.  On the other hand, "the common law does not roam freely over and through specific Code provisions but supplies a loss-allocation framework only when specific . . . provisions do not."  Prestige Imports, Inc. v. South Weymouth Savings Bank, 916 N.E.2d 1015, 1024 n.13 (Mass.App.Ct. 2009) (citing inter alia section 1-103).  Consequently, "Where a UCC provision [as enacted in Massachusetts] specifically defines parties' rights and remedies, it displaces analogous common-law theories of liability."  Gossels v. Fleet Nat. Bank, 902 N.E.2d 370, 376 (Mass. 2009).

Turning to section 3-309, statutory interpretation "always starts with the language of the statute itself."  Matamoros v. Starbucks Corp., 699 F.3d 129, 134 (1st Cir. 2012) (interpreting Massachusetts law).  Typically, "the ordinary meaning of the

statutory language" applies.  <u>Id.</u>  "[R]esort to extrinsic aids

to statutory construction (such as legislative history)" is

appropriate "only when the wording of the statute is freighted

with ambiguity or leads to an unreasonable result."  <u>Id.</u>  Here,

the plain language of section 3-309 entitles "[a] person not in

possession of an instrument" to enforce it "if . . . the person

was in possession of the instrument and entitled to enforce it

when loss of possession occurred."  Mass. Gen. L. ch. 106, § 3-

309(a).

Relying on two bankruptcy court decisions in this district,

<u>In re Harborhouse of Gloucester, LLC</u>, 505 B.R. at 373

("<u>Desmond</u>"), <u>aff'd</u>, 523 B.R. 749 (B.A.P. 1st Cir. 2014),[13] and

<u>Marks v. Braunstein</u>, 439 B.R. 248, 251 (D.Mass. 2010) ("<u>Marks</u>"),

Moynihan argues that plaintiff did not have possession of the

note when it was lost.  Actual possession is the standard,

according to Moynihan, and plaintiff did not have actual

possession because Ocwen and then Ablitt (now CGAW) had actual

possession at the time the note was lost.  Moynihan further

submits that plaintiff transferred the note to Ocwen and

therefore cannot rely on agency principles as a means to enforce

the note.

---

[13]  Moynihan cites to the case as <u>Desmond v. Raymond C. Green,
Inc.</u>, 505 B.R. 365 (Bankr.D.Mass. 2014), which, for ease of
reference, this court refers to as <u>Desmond</u>.

A Massachusetts Land Court decision succinctly explains the import of Desmond and Marks, both of which interpret section 3-309, as:

> mean[ing] that a mortgage note that was lost or destroyed prior to its assignment by a person executing a lost note affidavit cannot be enforced by a downstream assignee in possession of the mortgage instrument, who was not in possession of the note and entitled to enforce it at the time the note was lost.

Zullo v. HMC Assets, LLC, 2014 WL 4217417, at *8 (Mass. Land Ct. Aug. 27, 2014), aff'd, 43 N.E.3d 348 (Mass.App.Ct. 2015) (citing Desmond, 505 B.R. at 373, and Marks, 439 B.R. at 251, and noting that Marks follows Dennis Joslin Co., LLC v. Robinson Broad. Corp., 977 F.Supp. 491, 495 (D.D.C. 1997) ("Joslin")).  First and foremost, plaintiff is not a downstream assignee or transferee.[14]  Under the facts construed in plaintiff's favor, plaintiff is the entity which had actual, physical possession of the note, gave the note to its agent (Ocwen) and Ocwen gave it to Ablitt (now CGAW), plaintiff's agent and attorney.  Thus, the Rule 12(b)(6) facts easily allow a finding that, "when loss of possession occurred" of the note, Mass. Gen. L. ch. 106, § 3-309, plaintiff's agent had actual possession.  The Rule 12(b)(6) facts likewise readily permit a finding that there was no

---

[14]  As explained below, taking the facts in the Rule 12(b)(6) record as true, Ocwen was plaintiff's agent as was Ablitt (now CGAW).

transfer of ownership in the note from plaintiff to another entity.

In contrast, Desmond involved the enforcement of a note lost by an upstream transferor, Philip J. Hansbury, as trustee of the 90 Rantoul Real Estate Trust ("Hansbury"), who executed a lost note affidavit. In re Harborhouse of Gloucester, LLC, 505 B.R. at 367. Hansbury then transferred the note to Connect Plus International Corporation ("CPIC"), which then assigned the note to the defendant Green. Id. As stipulated by Green, he never had possession of the note at the time it was lost by Hansbury. Id. at 370.

Similarly, the person attempting to enforce the lost promissory note in Marks "stipulated that he was not in possession of the Note and he did not know where it was located nor who was in possession of it." Marks v. Braunstein, 439 B.R. at 250. In light of such evidence, the lower court determined that Marks "did not meet the prerequisites of § 3-309 because he offered no proof that he was *ever* in possession of the Note." Id. at 251 (emphasis in original). The court in Marks affirmed this finding as well as the lower court's denial of a motion for reconsideration. Id. at 250-52. Likewise, the plaintiff in Joslin seeking to enforce a lost note "never had actual possession of the note, and plaintiff concede[d] that the note was lost while the FDIC-not plaintiff-was in possession."

33

*Dennis Joslin Co., LLC v. Robinson Broad. Corp.*, 977 F.Supp. at 494.

*Desmond*, *Marks* and *Joslin* are therefore distinguishable because the parties seeking to enforce a lost note never also had possession of the note at the required time, i.e., "when loss of possession occurred." Mass. Gen. L. ch. 106, § 3-309. Here, construing the Rule 12(b)(6) facts in plaintiff's favor, plaintiff's agent had possession of the note when the loss occurred, plaintiff has not transferred or assigned the note to another entity, and plaintiff (as opposed to the downstream entity) is seeking to enforce the note.

The language of section 3-309 lends support to this distinction. It provides that, "A person not in possession of [the note] is entitled to enforce the [note] if (i) the person was in possession of the [note] and entitled to enforce it when loss of possession occurred." Mass. Gen. L. ch. 106, § 3-309. Thus, the reference initially to "[a] person" and then to "the person" indicates that it is the same person who had possession of the note at the time of the loss and who presently seeks to enforce the note under section 3-309.

Moynihan's reliance on an illustration of possession under section 3-309 in *Marks* quoting a well known treatise is also misplaced. The quoted illustration of the concept of possession in section 3-309 reads as follows:

34

"A payee who receives a check in payment for service and then loses the check while walking home can still enforce the instrument.  Similarly, if the payee was the victim of a mugging on the way home, and the thief made off with the payee's wallet containing the check, the payee remains entitled to enforce the instrument.

If, on the other hand, the drawer had entrusted a messenger with delivery of the check to the payee, and the messenger instead chose to flee to Jamaica with the check, the payee would not be able to enforce the instrument because the payee would not have had possession at the time of the loss."

Marks v. Braunstein, 439 B.R. at 251 (quoting 2 James White and Robert Summers, Uniform Commercial Code § 18-2 (5th ed. 2009)). Moynihan submits that plaintiff is the payee and Ocwen and Ablitt are the "entrusted messengers." (Docket Entry # 12). Under the facts in the illustration, however, the entrusted messenger is the agent of the drawer, which never delivered the check to the payee because the drawer's messenger absconded with it.  Thus, neither the payee nor its agent had possession of the note.  The illustration therefore does not apply to plaintiff because, construing the Rule 12(b)(6) facts in its favor, plaintiff had actual, physical possession of the note and, when the loss occurred, plaintiff's agent had possession of the note and plaintiff was entitled to enforce it.  In short, construing the Rule 12(b)(6) facts in plaintiff's favor, Ocwen, as agent, or Ablitt, as plaintiff's attorney, held the note on behalf of plaintiff, as noteholder, with plaintiff retaining enforcement rights associated with the note.

Moynihan further cites a Massachusetts case that recognizes that, "The 'fiction of "constructive possession" has no application when another is in actual possession.'" Attorney General v. Dime Sav. Bank of New York, FSB, 596 N.E.2d 1013, 1016 (Mass. 1992) (finding constructive possession inapplicable where mortgagee sought to bring trespass action against holdover tenant then in physical possession of property). Dime Savings is distinguishable because it involved an action for trespass against a holdover tenant as opposed to a plaintiff not in possession of a note seeking to enforce the note under section 3-309.

The issue therefore reduces to whether the term "person" in section 3-309 includes the person's agents, i.e., whether section 3-309 displaces Massachusetts principles of common law agency. See Mass. Gen. L. ch. 106, § 1-103. Examining whether the particular provisions of section 3-309 displace principles of agency under Massachusetts common law, the plain language of section 3-309 refers to "the person" without any reference to the person's agents or any other principle of agency law. Overall, there is nothing in the section that *specifically* requires abandonment of common law principles of agency. See Terry v. Kemper Ins. Co., 456 N.E.2d at 467 (construing section 1-103 and "find[ing] nothing in G.L. c. 106, § 3-116 and § 3-404, which specifically requires abandonment of common law

agency principles in connection with the facts of this case");
see also Inn Foods, Inc. v. Equitable Co-Operative Bank, 45 F.3d
594, 597 (1st Cir. 1995) (applying agency principle of
ratification of agent's acts to conversion of check with forged
indorsement); Kenerson v. F.D.I.C., 44 F.3d 19, 32 (1st Cir.
1995) ("U.C.C. and the New Hampshire statute do not displace the
common law agency rule"); see generally Hurwitz v. Bocian, 670
N.E.2d 408, 412 (Mass.App.Ct. 1996) ("[s]ection 2-201 has been
held not to preclude recovery that is 'warranted on the basis of
promissory estoppel'" and "[t]he differences between § 2-201 and
§ 8-319," the provision at issue, "are not sufficiently
significant to justify a conclusion that estoppel is applicable
to one but not the other") (internal citation omitted).

Ordinarily, corporations act through their agents.  See
Durand v. IDC Bellingham, LLC, 793 N.E.2d 359, 369 (Mass. 2003)
("[c]orporations act through their authorized agents, and when a
corporation's actions come into question, we attribute to the
corporation the actions, words, and knowledge of its agents
acting within their authority"); Sarvis v. Boston Safe Deposit
and Trust Co., 711 N.E.2d 911, 920 (Mass.App.Ct. 1999)
("corporation is a creature of the law, a 'separate and distinct
legal entity that can only act through its agents'") (ellipses,
brackets and internal citation omitted).  Comments to section 3-
201, a section that defines "negotiation" as a "transfer of

possession," further assume that possession of an instrument occurs "directly or through an agent."  Mass. Gen. L. ch. 106, § 3-201, cmt. 1.

Section 3-309 does not bar or foreclose claims of possession grounded upon agency.  More specifically, nothing in section 3-309 precludes a person from enforcing a lost note when, at the time the loss occurred, the person had constructive possession, through its agent, of the note; was entitled to enforce the note at that time; and is now seeking to enforce it without having transferred or assigned the note to another person or entity downstream.  In such circumstances, principles of agency do not displace the provisions of section 3-309.  In sum, Moynihan is not entitled to a dismissal of the complaint based on the argument that, under section 3-309, plaintiff did not actually possess the note at the time of the loss.

## II.  Transfer

Moynihan next argues that the agency relationship is irrelevant because plaintiff transferred the enforcement rights to either Ocwen or Ablitt under chapter 106, section 3-203 ("section 3-203").  Moynihan asserts that "[t]he purpose of each transfer was the prosecution of foreclosure, which is an enforcement right under" chapter 106.  (Docket Entry # 12).  Plaintiff submits that it did not transfer the note to Ocwen or Ablitt, its attorneys, for the purpose of giving them an

independent right to enforce the note.  Further, plaintiff contends that Moynihan was discharged of any personal liability on the note by the bankruptcy court and any transfer was for the purpose of prosecuting the foreclosure of the mortgage as opposed to enforcing the note against Moynihan.  (Docket Entry # 21).

Section 3-309(a)(ii) allows a person to enforce a lost instrument if "the loss of possession was not the result of a *transfer* by the person."  Mass. Gen. L. ch. 106, § 3-309(a) (emphasis added).  Section 3-203 governs the transfer of the promissory note.  See In re Dudley, 502 B.R. 259, 276 (Bankr.W.D. Va. 2013) (citing section 3-203 and In re Gavin, 319 B.R. at 31).  Under section 3-203, "[a]n instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument."  Mass. Gen. L. ch. 106, § 3-203(a); see In re Gavin, 319 B.R. at 31 ("instrument is 'transferred' when it is delivered by the holder for the purpose of giving the recipient the right to enforce the instrument").

In order to show that plaintiff transferred the enforcement rights to either Ocwen or Ablitt, the Rule 12(b)(6) record must show "first, that physical delivery of the Note was made [to that party], and second, that the intent of the transferor was

39

to give [that] party 'the right to enforce the instrument.'"
Zea v. JP Morgan Chase Bank, 2012 WL 996767, at *5 (D.Mass.
March 22, 2012) (party established it was nonholder in
possession with rights of holder because note gave party right
to contest claims as part of that party's enforcement rights).
The comment to section 3-203 "explains that while the transferee
of an instrument may enforce the instrument without being its
holder, the transferee, unlike a holder, is not entitled to the
presumption of the right of enforcement, and must prove the
transaction through which the instrument was acquired."  In re
Thomas, 447 B.R. 402, 411 (Bankr.D.Mass. 2011) (citing section
3-203, cmt. 1 (1999)); see Mass. Gen. L. ch. 106, § 3-203, cmt.
1 (1999).  "If delivery [of the instrument] is for some other
purpose, there has not been a transfer."  22 Williston on
Contracts § 60:27 (4th ed. 2015) (citing Uniform Commerical Code
section 3-203(a)); accord Mass. Gen. L. ch. 106, § 3-203, cmt. 1
(1999) (if delivery "is for some purpose other than transfer of
the right to enforce," no section 3-203 transfer takes place).
"A delivery of an instrument to someone for safekeeping is not a
transfer."  22 Williston on Contracts § 60:27 (4th ed. 2015)
"Similarly, the presentment of a check to a drawee for payment
is not a transfer."  Id.

     The Rule 12(b)(6) facts set out a plausible theory that
plaintiff intended to give the note to Ocwen, as its agent, for

a purpose other than enforcing the note.  Cf. In re Neals, 459 B.R. 612, 618 (Bankr.D.S.C. 2011); In re Miller, 2014 WL 2860985, at *4 (Bankr.D.Vt. June 23, 2014); see generally In re Montagne, 421 B.R. 65, 77 (Bankr.D.Vt. 2009).  Furthermore, Ocwen provided physical delivery of the orginal note to Ablitt, which plaintiff identifies as its attorney.  Therefore, in light of the facts evidencing that plaintiff may not have intended to give Ocwen and Ablitt enforcement rights, Moynihan's argument does not warrant a dismissal of the complaint.

## CONCLUSION

In accordance with the foregoing discussion, the Rule 12(b)(1) motion to dismiss (Docket Entry # 9) and the Rule 12(b)(6) motion to dismiss (Docket Entry # 11) are **DENIED**.  This court will conduct a scheduling conference on August 8, 2016 at 2:45 p.m.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge