UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DEUTSCHE BANK NATIONAL TRUST,
AS TRUSTEE FOR IXIS 2006-HE3,
    Plaintiff,

    v.                             CIVIL ACTION NO.
                                       15-14155-MBB

JAMES P. MOYNIHAN,
    Defendant.


**MEMORANDUM AND ORDER RE:**
**PLAINTIFF DEUTSCHE BANK NATIONAL TRUST COMPANY'S MOTION FOR**
**SUMMARY JUDGMENT**
**(DOCKET ENTRY # 63)**

**September 19, 2017**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment
filed by plaintiff Deutsche Bank National Trust Company, as
Trustee for IXIS 2006-HE3 ("DBNTC"), seeking to enforce a lost
promissory note. (Docket Entry # 63). Defendant James P.
Moynihan ("defendant") opposes the motion. (Docket Entry # 73).
After conducting a hearing on April 25, 2017, this court took the
motion under advisement. (Docket Entry # 77).

PROCEDURAL BACKGROUND

The parties' dispute arises out of a promissory note
executed by defendant and secured by a mortgage on property in
Lowell, Massachusetts, where defendant resides ("the property").
(Docket Entry # 1). The complaint sets out two counts against

defendant and former defendant Durham Commercial Capital Corporation ("Durham"). (Docket Entry # 1, p. 8). Count One requests a declaratory judgment in favor of DBNTC against defendant establishing that DBNTC rightfully owns the note and is "entitled to immediate physical possession of the original [of the note]." (Docket Entry # 1, ¶ 40). Count Two requests a declaratory judgment in favor of DBNTC against defendant establishing that DBNTC, under section one of Massachusetts General Laws chapter 231A and section 3-301(iii) ("section 3-301") of Massachusetts General Laws chapter 106 ("chapter 106"), is entitled to enforce the terms of the note and the mortgage granting DBNTC a security interest in the property and may exercise the "default remedies provided for in the mortgage including exercise of the statutory power of sale." (Docket Entry # 1, ¶ 45). On August 22, 2016, DBNTC filed a notice voluntarily dismissing Durham from this action. (Docket Entry # 45).

On March 2, 2017, DBNTC moved for summary judgment under Fed.R.Civ.P. 56 ("Rule 56") based on three arguments. (Docket Entry ## 63, 64). DBNTC contends that it is entitled to enforce the note under chapter 106, sections 3-301 and 3-309. (Docket Entry # 64, p. 5). DBNTC also maintains that declaratory relief is warranted because defendant is judicially and collaterally estopped from challenging DBNTC's enforcement of the note.

(Docket Entry # 64, pp. 10, 13).  Defendant submits that DBNTC's motion should be denied because there is a genuine issue of material fact as to whether DBNTC ever had possession of the promissory note and if the note was even lost.  (Docket Entry # 73, pp. 1, 8).  Defendant also counters the judicial and collateral estoppel arguments made by DBNTC.  (Docket Entry # 73, pp. 10-13).

## STANDARD OF REVIEW

Summary judgment is designed to "'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Tobin v. Federal Express Corp., 775 F.3d 448, 450 (1st Cir. 2014) (quoting Wynne v. Tufts University School of Medicine, 976 F.2d 791, 794 (1st Cir. 1992)).  It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  It is inappropriate "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side."  Pierce v. Cotuit Fire District, 741 F.3d 295, 301 (1st Cir. 2014); see also Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir. 2007) (applying same legal standard applied by district court when reviewing summary judgment ruling).

"Genuine issues of fact are those that a factfinder could

resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) (quoting Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 673 F.3d 53, 56 (1st Cir. 2011)). The evidence is viewed "in the light most favorable to the non-moving party" and "all reasonable inferences" are drawn in his favor. Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014). In reviewing a summary judgment motion, a court may examine "all of the record materials on file," Geshke v. Crocs, Inc., 740 F.3d 74, 77 (1st Cir. 2014), "including depositions, documents, electronically stored information, affidavits or declarations . . . or other materials." Fed.R.Civ.P. 56(c)(1); see Ahmed v. Johnson, 752 F.3d at 495. "Unsupported allegations and speculation," however, "do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." Rivera-Colon v. Mills, 635 F.3d 9, 12 (1st Cir. 2011); see Serra v. Quantum Servicing, Corp., 747 F.3d 37, 39-40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded"). Adhering to this framework, the record sets out the following facts.

FACTUAL BACKGROUND

4

In a quitclaim deed dated August 28, 2003 and recorded at the Middlesex North Registry of Deeds, defendant acquired the property located at 619-621 Stevens Street in Lowell, Massachusetts. (Docket Entry # 65-2). Defendant, as borrower, executed the promissory note dated May 1, 2006 in favor of New Century Mortgage Corporation ("New Century"), as lender, in the original principal amount of $360,000. (Docket Entry # 65-3). The note was payable "to the order of, without recourse New Century Mortgage Corporation." (Docket Entry # 65-3, p. 7).[1] Above the printed name "New Century Mortgage Corporation" was a blank signature line. (Docket Entry # 65-3, p. 7). Defendant was the only borrower on the note. (Docket Entry # 65-3, p. 6). The note expressly allows "the Lender" to transfer the note and states that, "The Lender or anyone who takes [the note] by transfer and who is entitled to receive payments under [the note] is called the 'Note Holder.'" (Docket Entry # 65-3, p. 2).

Defendant agreed to make monthly payments of $2,703.90 on the first day of each month starting on June 1, 2006. (Docket Entry # 65-3, pp. 2-3). The note dictated that the monthly payments applied to interest before principal. (Docket Entry # 65-3, p. 2). The note further contained a flexible, index-based interest rate that adjusted every six months after the first day

---

[1]  Page numbers refer to the page as docketed as opposed to the page number of the document itself.

of May 2008.  (Docket Entry # 65-3).  The interest rate on the
principal would range between 9.013% and 10.513% at the first
adjustment date and would not drop below 9.013% nor exceed
16.013%.  (Docket Entry # 65-3, p. 4).  The note also stated that
defendant would default if he failed to make the monthly payments
in full.  (Docket Entry # 65-3, p. 5).  As stated in the note,
the "Note Holder may enforce its rights under this [n]ote against
each [borrower] individually or against all of [the borrowers]
together."  (Docket Entry # 65-3, p. 5).  The note was "governed
by federal law and the law of the jurisdiction in which the
property encumbered by the Security Instrument . . . is
located[,]" i.e., Massachusetts.[2]  (Docket Entry # 65-3, p. 6).

On May 1, 2006, to secure the repayment and other
obligations contained in the note, defendant granted a mortgage
encumbering the property to New Century.  (Docket Entry # 65-4).
Like the quitclaim deed, the mortgage is recorded at the
Middlesex North Registry of Deeds.  (Docket Entry # 65-4).  The
mortgage provides notice to defendant that "one or more changes
of the Loan Servicer [might occur] unrelated to a sale of the
[note]" during the life of the mortgage.  (Docket Entry # 65-4,
pp. 11-12).  Under the terms of the mortgage, defendant conveyed
and granted New Century and its "successors and assigns" the

---

[2]  The parties do not dispute the terms of the note.

6

"power of sale."  (Docket Entry # 65-4, pp. 3, 13).

Separately, New Century entered into a Mortgage Loan
Purchase and Servicing Agreement ("MLPSA") with NC Capital
Corporation ("NC Capital") dated December 1, 1998.  (Docket Entry
# 65-7).  The MLPSA allowed New Century to sell NC Capital pools
of mortgage loans determined by the parties to the agreement.
(Docket Entry # 65-7, p. 5).  The MLPSA also contained a mortgage
loan document delivery procedure:  "[T]he Company shall . . ., at
least four (4) Business Days prior to the Closing Date, deliver
and release to the Custodian those Mortgage Loan Documents as
required by the Custodial Agreement with respect to each Mortgage
Loan . . ..  The Custodian shall certify receipt of all such
Mortgage Loan Documents . . .."  (Docket Entry # 65-7, p. 20).

In 2006, NC Capital entered into a Third Amended and
Restated Mortgage Loan Purchase and Warranties Agreement with
IXIS Real Estate Capital, Inc. ("IXIS") dated April 1, 2006.
(Docket Entry # 65-8).  IXIS entered into an Unaffiliated
Seller's Agreement ("USA") with Morgan Stanley ABS Capital I Inc.
("Morgan Stanley") as depositor on September 1, 2006, effective
September 29, 2006.  (Docket Entry # 65-9).  The USA vested
ownership of each mortgage loan and each related note in Morgan
Stanley upon the sale of the mortgage loans.  (Docket Entry #
65-9, pp. 6-7).  The USA also provided that:

The contents of any Mortgage File in the possession of the

> Unaffiliated Seller [IXIS] at any time after such sale,
> and any principal and interest due . . . and received by
> or on behalf of the Unaffiliated Seller, shall be held in
> trust by the Unaffiliated Seller for the benefit of the
> Depositor [Morgan Stanley] . . ..

(Docket Entry # 65-9, p. 7).

Meanwhile, Morgan Stanley entered into a Pooling and Service

Agreement ("the PSA") on September 1, 2006 with IXIS, as

unaffiliated seller, and DBNTC, as trustee and custodian,

establishing IXIS Real Estate Capital Trust 2006-HE3 ("Trust

2006-HE3") effective September 29, 2006.  (Docket Entry # 65-10,

pp. 1, 31).  The PSA also identified Saxon Mortgage Services,

Inc. ("Saxon") as a loan servicer.  (Docket Entry # 65-10).

Section 2.01(a) of the PSA conveyed all of Morgan Stanley's

rights, title, and interest in the "Trust Fund," which the PSA

defines as the "Mortgage Loans" in the "Mortgage Loan Schedule,"

to DBNTC as trustee.  (Docket Entry # 65-10, pp. 54, 73, 74).

The "Moynihan" loan on the property at "619-621 Stevens Street"

was one of the loans included in the Mortgage Loan Schedule.

(Docket Entry 65-1, ¶ 11) (Docket Entry # 65-12).  As stated in

the PSA, upon the sale of the "Mortgage Loans" to DBNTC, it

obtained ownership and possession of the note or of the note held

"in trust" for the benefit of DBNTC.[3]  (Docket Entry # 65-9, §

---

[3]  The relevant language reads as follows:

> Upon the sale of such Mortgage Loans, the ownership of each
> related Mortgage Note . . . shall immediately vest in . . .

2.01(b).  Section 2.01(b) further states that, "In connection
with the transfer and assignment of each Mortgage Loan, the
Unaffiliated Seller has delivered or caused to be delivered to
the Custodian . . . the original Mortgage Note bearing all
intervening endorsements evidencing a complete chain of
assignment from the originator to the related Originator . . .."
(Docket Entry # 65-10, pp. 74-75).  DBNTC therefore obtained
possession of the original note from Morgan Stanley pursuant to
the PSA and attached schedule, which included the Moynihan loan.
(Docket Entry # 65-1, ¶¶ 10, 11) (Docket Entry # 65-10, pp. 54,
73, 74) (Docket Entry # 65-12).  Pursuant to section 2.08(h) of
the PSA, Morgan Stanley warranted that it had good title and sole
ownership of the mortgage loans, free of any interest of any
other person.  (Docket Entry # 65-10, p. 89).

    According to the note possession history record, DBNTC
received the collateral file[4] containing the original promissory

_____

> [DBNTC] and the ownership of all related records and
> documents with respect to each Mortgage Loan prepared by or
> which come into the possession of  . . . [Morgan Stanley]
> shall immediately vest in . . . [DBNTC].  The contents of
> any Mortgage File . . . shall be held in trust by . . .
> [Morgan Stanley] for the benefit of . . . [DBNTC] as the
> owner thereof, and shall be promptly delivered by . . .
> [Morgan Stanley] to or upon the order of . . . [DBNTC].

(Docket Entry # 65-9, pp. 6-7).
[4]  DBNTC does not list all of the materials contained in the
collateral file, but does state that the collateral file
included the original note.  (Docket Entry # 1, ¶ 21).  DBNTC
and defendant agree that the so-called collateral file initially

note on May 12, 2006.  (Docket Entry # 65-17).  DBNTC therefore had possession of the note endorsed in blank as of May 12, 2006. (Docket Entry # 65-17).  (Docket Entry # 65-1, ¶ 13).  Any discrepancy between the date DBNTC acquired possession of the note as evidenced by the note possession history (May 12, 2006) or as evidenced by the PSA and Mortgage Loan Schedule (September 29, 2006) does not create an issue of material fact because under either scenario, DBNTC had possession of the original note no later than September 29, 2006, prior to the time of loss. (Docket Entry # 65-1, ¶¶ 10, 11) (Docket Entry # 65-10, pp. 31, 54, 74) (Docket Entry # 65-12) (Docket Entry # 65-17).

Before January 1, 2008, defendant defaulted on his monthly payments.  (Docket Entry # 24-2).  By affidavit, defendant states that after granting the mortgage to New Century in 2006, he made a number of monthly mortgage payments to New Century "[f]rom 2006 to 2008."[5]  (Docket Entry # 73-4, p. 1).  On June 19, 2008, defendant filed for bankruptcy in the United States Bankruptcy Court for the District of Massachusetts ("the bankruptcy court"). (Docket Entry # 65-14).  In the voluntary bankruptcy petition, defendant expressly stated that he intended to surrender the property to the creditor, Saxon.  (Docket Entry # 65-14, p. 36).

---

included the original note.

[5] Defendant does not identify the month or the months that he made the payments to New Century in 2006.

On October 7, 2008, the bankruptcy court granted defendant a chapter seven discharge from his legal obligation to pay the property debt.  (Docket Entry # 65-15).

In an assignment dated November 11, 2008 and effective May 7, 2008, New Century transferred the mortgage to DBNTC, as trustee, in care of Saxon as servicer.  (Docket Entry # 1-5, p. 2).  The assignment states that, "New Century Mortgage Corporation . . . FOR GOOD AND VALUABLE CONSIDERATION RECEIVED, hereby grants, assigns and transfers to Deutsche Bank National Trust Company, as Trustee for IXIS 2006-HE3 . . . All of the right, title, and interest that said New Century Mortgage Corporation has . . .."  (Docket Entry # 1-5, p. 2).  The assignment was recorded at the Middlesex North Registry of Deeds.  (Docket Entry # 1-5, p. 2).  Sometime in 2008 after the transfer of the mortgage, defendant contacted Saxon by telephone and spoke to an unidentified individual.  (Docket Entry # 73-4).  Defendant asked the individual for a copy of the promissory note.  (Docket Entry # 73-4).  The Saxon official was unable to locate a copy and did not know who held the note.[6]  (Docket Entry # 73-4).

---

[6]  Defendant's recitation of the Saxon official's statements is not considered for the truth of the matter asserted, i.e., that the official did not know who held the note.  Rather, it is considered to show possession of the note at and around the time period of the 2008 conversation.  See Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 41 (1st Cir. 2011).

Effective April 16, 2010, Ocwen Loan Servicing, LLC ("Ocwen") obtained the servicing rights for the loan from Saxon. (Docket Entry # 65-6). Ocwen's obligations as DBNTC's servicer included:

> sending statements or coupons to the borrower to facilitate payment, collecting payments from the borrower and making scheduled disbursements of principal and interest accounts making disbursements from such account[s] to pay real estate taxes and or hazard insurance premiums due in connection with the [p]roperty and to perform other usual and customary residential loan servicing functions.

(Docket Entry # 24, ¶ 3). In a document dated May 21, 2010, DBNTC granted a limited power of attorney ("the LPOA") to Ocwen. (Docket Entry # 65-13). The LPOA was recorded at the Middlesex North Registry of Deeds. (Docket Entry # 65-13). The LPOA authorized Ocwen to execute various documents on behalf of DBNTC regarding foreclosure proceedings for loans held by DBNTC. In relevant part, the LPOA states that:

> Deutsche Bank National Trust Company . . . hereby constitutes and appoints Ocwen Loan Servicing LLC. As Servicer . . . the Trustee's true and lawful Attorney-in-Fact, *in the Trustee's name*, place and stead and *for the Trustee's benefit*, in connection with all mortgage loans serviced by the Servicer pursuant to the Agreements solely for the purpose of performing such acts and executing such documents *in the name of the Trustee* necessary and appropriate to effectuate the following enumerated transactions in respect of any of the mortgages or deeds of trust . . . and promissory notes secured thereby (the "Mortgage Notes") for which the undersigned is acting as Trustee for various certificate holders . . ..

(Docket Entry # 65-13, p. 2) (emphasis added). The LPOA enumerated transactions Ocwen was allowed to carry out on behalf of DBNTC, including, "With respect to a Mortgage or Deed of

Trust, the foreclosure, the taking of a deed in lieu of foreclosure, or the completion of judicial or non-judicial foreclosure or termination, cancellation or rescission of any such foreclosure . . .." (Docket Entry # 65-13, p. 3).

On August 16, 2010, defendant filed a complaint in the Massachusetts Land Court Department of the Trial Court ("the land court") seeking a determination that DBNTC did not hold the mortgage encumbering the property. (Docket Entry # 1-6). During this proceeding, Ablitt Scofield, P.C. ("Ablitt"), a law firm located in Woburn, Massachusetts, represented DBNTC. (Docket Entry ## 65-16, 65-19).

On or about July 20, 2011, DBNTC released the collateral file containing the note to Ocwen. (Docket Entry # 65-1, ¶ 13) (Docket Entry # 65-17).[7] On or about August 16, 2011, Ocwen returned the file, which contained the original of the note to DBNTC. (Docket Entry # 65-17). On October 18, 2011, DBNTC again gave the file containing the original of the note to Ocwen. Ocwen received the file on November 3, 2011. (Docket Entry # 65-1, ¶ 13) (Docket Entry # 65-17) (Docket Entry # 65-20, pp. 1-3, 13). On or about November 21, 2011, Ocwen, DBNTC's servicer,

---

[7] By affidavit, DBNTC authenticates a screenshot of the note possession history (Docket Entry # 65-17) evidencing it both received the collateral file with the original note on May 12, 2006 and released it on July 20, 2011. (Docket Entry # 65-1, ¶¶ 13, 14) (Docket Entry # 65-20). Defendant seeks to strike the screenshot as hearsay.

gave the original of the note to Ablitt as an attachment to an attorney bailee letter in order to commence and proceed with foreclosure of the property. (Docket Entry # 65-1, ¶¶ 13, 14) (Docket Entry ## 65-17, 65-18) (Docket Entry # 65-20, pp. 1-3, 14-15). The attorney bailee letter states that, "By signing this letter agreement below where indicated, you [Ablitt] confirm that you are currently holding Documents on behalf of the Servicer [Ocwen] and the Owner [DBNTC], and shall only act in accordance with either the Servicer's or the Owner's instructions with regard to the Documents." (Docket Entry # 65-20, p. 17).

On December 30, 2011, the land court entered a judgment that, "by virtue of the assignment of the mortgage dated November 11, 2008, . . . DBNTC is the current record holder of the Mortgage, entitled to exercise the power of sale contained in the Mortgage." (Docket Entry # 1-6, p. 3). The judgment also declared that DBNTC "may exercise the power of sale contained in the Mortgage to foreclose it without regard to whether or not DBNTC is the current holder of the Note." (Docket Entry # 1-6, p. 3).

Sometime in 2011, Ablitt began having cash-flow issues. (Docket Entry # 73-1, p. 22). On or about November 7, 2012, Ablitt entered into a factoring agreement entitled "Nonrecourse Receivables Purchase Contract and Security Agreement" ("the factoring agreement") with a previous lender, Durham. (Docket

Entry # 73-1, pp. 22, 25).  Under the factoring agreement, Durham

agreed to purchase certain receivables of Ablitt's "in full

amount of advances . . . not exceed[ing] $1,200,000."  (Docket

Entry # 73-1, p. 26).  In the factoring agreement, Ablitt also

gave Durham a security interest in Ablitt's accounts,

"'promissory notes, chattel paper' . . . [and] 'general

intangibles.'"  (Docket Entry # 73-1, p. 27).  DBNTC alleged in

its complaint that the security interest included "custody and

control over [Ablitt]'s assets, files, records, electronically

stored data, hard drives and/or case management systems, not

otherwise identified and retrieved by [Ablitt]'s former clients."

(Docket Entry # 1, ¶ 35).  The complaint also alleges that Durham

"obtained and retained" the note.[8]  (Docket Entry # 1, ¶ 36).

Ablitt continued to deteriorate in 2013 and early 2014.  (Docket

Entry # 73-1, p. 23).  As a result, Durham began to exert a level

of managerial control over Ablitt's affairs, culminating in a

firm name change to Connolly, Geaney, Ablitt and Willard, P.C.

("CGAW").  (Docket Entry # 65-19) (Docket Entry # 73-1, p. 26).

Sometime in late July or August 2014, CGAW ceased operations.

(Docket Entry # 73-1, p. 23).

---

[8]  Defendant seeks to include these two statements from the
complaint as part of the summary judgment record.  The two
statements by DBNTC regarding Durham made in the complaint
constitute judicial admissions solely for purposes of resolving
the summary judgment motion.  See Schott Motorcycle Supply, Inc.
v. American Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992).

On or about September 3, 2014, three or more creditors of CGAW filed on CGAW's behalf an involuntary chapter seven bankruptcy petition in the bankruptcy court ("CGAW bankruptcy proceeding"). (Docket Entry # 73-1, p. 5). CGAW never returned the original of the note to DBNTC or Ocwen. (Docket Entry # 65-17) (Docket Entry # 65-20, ¶ 6). In a separate suit initiated by Ocwen against CGAW and Durham in the United States District Court for the Southern District of Florida, West Palm Beach Division, Durham filed a crossclaim on September 15, 2014 against Ablitt for breach of the factoring agreement and a counterclaim against Ocwen for failure to pay accounts. (Docket Entry # 73-2, pp. 1-13). On August 7, 2015, Ocwen renewed a motion for contempt against Durham for not furnishing documents related to receivable accounts in the CGAW bankruptcy proceeding. (Docket Entry # 73-1, pp. 2-21).

On September 12, 2016, Ocwen, as servicer of DBNTC, executed a lost note affidavit. (Docket Entry # 65-20). Therein, M. Johnson, Ocwen's authorized signer, attests that, based on his personal knowledge and servicing records kept in the course of Ocwen's regularly conducted business, DBNTC had possession of the note when the loss of possession occurred. (Docket Entry # 65-20, ¶¶ 1-2, 5). The affidavit further states that, despite a diligent search on April 1, 2016, "the original Note could not be located and" DBNTC "cannot reasonably obtain

possession of the original Note." (Docket Entry # 65-20, ¶ 6).
The affidavit also states that, "The original Note has been
inadvertently lost, misplaced, or destroyed, or is in the
wrongful possession of an unknown person that cannot be found or
is not amenable to service of process." (Docket Entry # 65-20, ¶
7).

In November 2014, Ocwen obtained an estimated fair market
valuation of the property of $264,000. (Docket Entry # 24, ¶
13) (Docket Entry # 24-3). In December 2015, Ocwen obtained an
estimated fair market valuation of the property of $268,000.
(Docket Entry # 24, ¶ 14) (Docket Entry # 24-4). As of February
25, 2016, the property had an assessed valuation of $282,900.
(Docket Entry # 10-3).

The "mortgage account with Ocwen is now due for the January
1, 2008 payment together with all subsequently accrued but unpaid
installments." (Docket Entry # 24, ¶ 11) (Docket Entry # 24-2).
The principal balance is $359,944.32. (Docket Entry # 24, ¶ 12)
(Docket Entry # 24-2). This amount does not include "accrued
interest, late charges, escrow advances, attorney's fees and
other charges assessed to the account in accordance with the
terms and conditions of the [note] and [mortgage]." (Docket
Entry # 24, ¶ 12) (Docket Entry # 24-2).

## DISCUSSION

DBNTC moves for summary judgment based on three arguments.

First, DBNTC contends it is entitled to enforce the note as trustee because it was in possession of the note and entitled to enforce it when loss of the note occurred. (Docket Entry # 64, p. 5). Second, DBNTC argues that defendant is judicially estopped from challenging DBNTC's enforcement of the note because defendant surrendered the property through the chapter seven bankruptcy proceeding. (Docket Entry # 64, p. 10). Third, DBNTC contends that defendant is collaterally estopped from challenging DBNTC's enforcement of the note because the land court ruled in favor of DBNTC's right to foreclose on the property in <u>Monynihan v. Deutsche Bank National Trust Company</u>, 10-MISC-436699. (Docket Entry # 64, p. 13).

Defendant counters that there is a genuine issue of material fact as to whether DBNTC ever had possession of the note and if the note was even lost. (Docket Entry # 73, pp. 1, 8). In addition, defendant maintains that this court cannot consider records DBNTC introduced under the business records exception to the hearsay rule because the supporting affidavits are conclusory and lack trustworthiness. (Docket Entry # 73, pp. 5-8). Finally, defendant opposes the judicial and collateral estoppel arguments made by DBNTC. (Docket Entry # 73, pp. 10-13).

A. <u>Enforcement of Note</u>

DBNTC maintains it is entitled to enforce the lost note

18

under chapter 106, section 3-309(b) ("section 3-309") because: DBNTC was entitled to enforce the note at the time the note was lost; and DBNTC was in possession of the note when its agent and attorney, Ablitt, lost the note. (Docket Entry # 64). DBNTC further asserts that it did not transfer the note to Ocwen or Ablitt for the purpose of giving either entity an independent right to enforce the note. Defendant contends that DBNTC fails to provide direct evidence showing it had physical possession or that the note was ever lost. Defendant argues that the 2008 conversation with the Saxon official and defendant's 2006 to 2008 mortgage payments to New Century create a disputed issue of fact regarding DBNTC's possession. Defendant also submits that this court cannot consider Ocwen's business records as an exception to the hearsay rule. (Docket Entry # 73).

As set out in this court's prior Memorandum and Order on defendant's motions to dismiss, the note is governed by Massachusetts law.[9] (Docket Entry # 41, p. 28) (Docket Entry # 65-3, p. 6). In Massachusetts, a person may enforce a note if the person is: "(i) the holder of the [note], (ii) a nonholder in possession of the [note] who has the rights of a holder, or (iii) a person not in possession of the [note] who is entitled to

---

[9] For ease of reference, this court summarizes the law set out previously (Docket Entry # 41) in order to place the parties' current arguments in context.

enforce the [note] pursuant to . . . 3-309." Mass. Gen. Laws ch. 106, § 3-301. DBNTC relies on section 3-301(iii) as the basis to enforce the note.

In accordance with the language of section 3-301(iii), section 3-309 governs the enforceability of a lost note under Massachusetts law. See In re Harborhouse of Gloucester, LLC, 505 B.R. 365, 370 (Bankr.D.Mass. 2014). Section 3-309(a) provides that:

> A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was *in possession of the instrument* and *entitled to enforce it when loss of possession occurred*, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

Mass. Gen. Laws ch. 106, § 3-309(a) (emphasis added). Section 3-309(b) further requires that a person not in possession of an instrument and:

> seeking enforcement of an instrument . . . must prove the terms of the instrument[10] and the person's right to enforce the instrument. If that proof is made, section 3-308 applies to the case as if the person seeking enforcement had produced the instrument. The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means.

---

[10] See footnote two and related text.

Mass. Gen. Laws ch. 106, § 3-309(b).  Overall, the plain language

of section 3-309 entitles "[a] person not in possession of an

instrument" to enforce it "if . . . the person was in possession

of the instrument and entitled to enforce it when loss of

possession occurred."  Mass. Gen. Laws ch. 106, § 3-309(a).

    (1) <u>Entitlement When Loss of Note Occurred</u>

    DBNTC initially argues that, once it obtained possession of

the note on May 12, 2006, it became entitled to enforce the note.

Defendant counters that DBNTC was not entitled to enforce the

note when the note was lost because it has not provided evidence

showing that the originator of the note, i.e., New Century,

transferred the wet ink note to DBNTC, as stated in the MLPSA

between New Century and NC Capital.  (Docket Entry # 73, pp. 2-

3).  Defendant maintains that an issue of fact exists as to

whether DBNTC ever had possession of the note from New Century

because defendant made mortgage payments directly to New Century

from 2006 to 2008.

    Under chapter 106, section 3-205(b) ("section 3-205(b)"),

"When indorsed in blank, an instrument becomes payable to bearer

and may be negotiated by transfer of possession alone until

specially indorsed."  Mass. Gen. Laws ch. 106, § 3-205(b).

Comment two of section 3-205(b) makes clear the requirements for

an instrument to be a blank endorsement:

    An indorsement made by the holder is either a special or

> blank indorsement.  If the indorsement is made by a holder
> and is not a special indorsement, it is a blank
> indorsement.  For example, the holder of an instrument,
> intending to make a special indorsement, writes the words
> "Pay to the order of" without completing the indorsement by
> writing the name of the indorsee.  The holder's signature
> appears under the quoted words.  The indorsement is not a
> special indorsement because it does not identify a person
> to whom it makes the instrument payable.  Since it is not a
> special indorsement it is a blank indorsement and the
> instrument is payable to bearer . . ..  A blank indorsement
> is usually the signature of the indorser on the back of the
> instrument without other words.

Mass. Gen. Laws ch. 106, § 3-205(b), cmt. 2.  Accordingly,

"'Under the UCC, one who possesses a note endorsed in blank is

the bearer of the note.'"  Dyer v. U.S. Bank, N.A., 141 F.Supp.

3d 149, 156 (D. Mass. 2015) ("Dyer") (citing chapter 106, section

3-205(b)), aff'd sub nom. Dyer v. Wells Fargo Bank, N.A., 841

F.3d 550 (1st Cir. 2016).  The court in Dyer found that defendant

U.S. Bank showed it held a homeowner's note at the time it

started foreclosure proceedings because the bank produced copies

of the promissory note endorsed in blank and affidavits showing

the bank was in possession of the note.  Id.

In the case at bar, the note states it is "Pay[able] to the

order of, without recourse New Century Mortgage Company," with a

blank line above New Century's name.  DBNTC also provided a copy

of the original note, affidavits from Ocwen officials averring to

DBNTC's possession of the note, and a note possession history

exhibit showing DBNTC either received the collateral file

containing the original note on May 12, 2006 or, pursuant to the

PSA and Mortgage Loan Schedule, on September 29, 2006.  DBNTC
additionally provided evidence through DBNTC's business records
that DBNTC temporarily released the original note to Ocwen, its
servicer, for the purpose of commencing foreclosure proceedings
on behalf of DBNTC.

In arguing that DBNTC must provide direct evidence of where,
when, and how it acquired the note from New Century, defendant
cites In re Gavin for the principle that a court cannot
reasonably infer whether a gap in the chain of title of a note
can be filled in with circumstantial evidence.  In re Gavin, 319
B.R. 27, 32-33 (B.A.P. 1st Cir. 2004) ("Gavin").  In Gavin, the
appellant bank, Premier, produced the original promissory note
for a line of credit signed by the debtor and payable to an
identifiable entity, the loan originator Fleet Bank ("Fleet").
Id. at 31-32.  Premier also produced the assignment of the note
from an intermediate creditor, Sovereign Bank ("Sovereign"), but
failed to produce evidence of an assignment from Fleet to
Sovereign.  Id. at 32.  The court held that, absent direct
evidence such as affidavits showing transfer of possession and
endorsement of the note from Fleet to Sovereign, "Premier has
failed to establish title to the Note . . .."  Id.  The court
reasoned that direct evidence is necessary to bridge a gap in
the chain of title so that "the Debtor will not sustain a loss
from another party claiming to own the Note."  Id. at 32-33.

In the present case, the note was endorsed in blank and not payable to an identified entity. The PSA agreement between Morgan Stanley and DBNTC stated that Morgan Stanley "has delivered or caused to be delivered to the Custodian [DBNTC]" the original blank endorsed note, "evidencing a complete chain of assignment." (Docket Entry # 65-10, pp. 74-75). Further, as evidenced by the note possession history, DBNTC had possession of the original note as of May 12, 2006 or, as evidenced by the PSA and Mortgage Loan Schedule, no later than September 29, 2006.[11] (Docket Entry # 65-17). DBNTC therefore had possession of the note no later than September 29, 2006. Indeed, the note possession history reflects that DBNTC "received the collateral file *including the original note*" on May 12, 2006. (Docket Entry # 65-17) (emphasis added).

It is true that the MLPSA between New Century and NC Capital sets out that NC Capital needed to certify receipt of all mortgage loan documents from New Century. (Docket Entry # 65-10, pp. 74-75). Defendant references this custodial

_____

[11] As explained in the prior Memorandum and Order, section 3-309 does not displace principles of agency law. (Docket Entry # 41, pp. 28-38). Hence, the fact that Morgan Stanley may have initially held the note in trust for the benefit of DBNTC and subject to DBNTC's order to deliver the note still leads to the conclusion that such constructive possession by DBNTC constitutes possession for purposes of section 3-309(a). In any event, the note possession history coupled with the lost note affidavit establish as a matter of law that DBNTC had possession of the original note when the loss occurred.

agreement to argue that, because DBNTC did not present custodial

receipt documents from NC Capital, DBNTC has not shown direct

evidence that the note was ever physically transferred between

parties.  The Massachusetts Bankruptcy and Bankruptcy Appellate

courts have addressed debtors' rights to question the validity of

foreclosures when the terms of PSAs are violated by creditors:

> The Debtors asked the bankruptcy court to declare the
> mortgage assignment invalid based upon non-compliance with
> the provisions of the PSA — a contract to which they were
> not a party — and to declare the state court foreclosure
> invalid on that basis.  As noted above, the Debtors are not
> parties, nor have they demonstrated that they were third-
> party beneficiaries of the PSA's terms.  We therefore agree
> with Judge Feeney's observation in In re Almeida where she,
> faced with a similar case, wrote:  "[The Party] is not a
> third party beneficiary of the PSA, and, ironically, he
> would appear to lack standing to object to any breaches of
> the terms of the PSA.  It would appear to this Court that
> the investors who bought securities based upon the pooled
> mortgages would be the parties with standing to object to
> any defects in those mortgages resulting from any failure
> to abide by the express provisions of the PSA."

Correia v. Deutsche Bank Nat'l Trust Co., 452 B.R. 319, 324

(B.A.P. 1st Cir. 2011) (quoting In re Almeida, 417 B.R. 140, 149

n.4 (Bankr.D.Mass. 2009)).  Accordingly, defendant lacks

standing to challenge violations of the MLPSA between New

Century and NC Capital because defendant was not a party to the

PSA agreement.

As previously discussed, the evidence shows that DBNTC had

possession of the blank note as of May 12, 2006, or as of

September 29, 2006 at the latest.  Further, Morgan Stanley

entered into the PSA with DBNTC as Trust 2006-HE3 trustee and
custodian on September 1, 2006.  (Docket Entry # 65-10).  The PSA
conveyed Morgan Stanley's rights, title, and interest in the
mortgage loans listed in the Mortgage Loan Schedule to DBNTC and
acknowledged a "complete chain of assignment" from Morgan Stanley
to DBNTC.  (Docket Entry # 65-10, pp. 74-75) (Docket Entry # 65-
17).  Defendant's note was one of the mortgage loans listed in
the Mortgage Loan Schedule and therefore transferred to DBNTC.
(Docket Entry # 65-1, ¶ 11) (Docket Entry # 65-12).

Defendant further maintains that DBNTC did not have
possession of the note because defendant made mortgage payments
to New Century from 2006 to 2008.  As evidenced above, however,
the documentary evidence establishes that DBNTC had possession of
the endorsed-in-blank note no later than September 29, 2006.  The
fact that defendant made mortgage payments to New Century until
2008 does not alter the fact that DBNTC had possession of the
note in 2006 and thereafter throughout the time defendant made
the aforementioned mortgage payments to New Century.  Although
New Century retained the mortgage until the transfer to DBNTC
effective on May 7, 2008, Massachusetts is a "title theory" state
in which a mortgage, the transfer of legal title, is distinct and
need not follow the note, the underlying security interest in a
property.  See In re Marron, 455 B.R. 1, 6 (Bankr.D.Mass. 2011);
United States Bank Nat'l Ass'n v. Ibanez, 941 N.E.3d 40, 55-56

(Mass. 2011).  During all or part of the time defendant made
mortgage payments to New Century, DBNTC, the note holder, had "an
equitable right to obtain an assignment of the mortgage."
Ibanez, 941 N.E.3d at 54.  Thus, even if defendant made mortgage
payments to New Century, the mortgage holder or mortgagee, until
2008, DBNTC possessed the note before New Century assigned the
mortgage to DBNTC in 2008 and had an equitable right to obtain an
assignment of the mortgage during the time defendant made the
payments.  Id.

      More notably and in any event, defendant's mortgage payments
to New Century do not create a genuinely disputed issue of
material fact regarding DBNTC's possession of the note at the
time of loss.  Rather, even considering the fact that defendant
made mortgage payments to New Century, no reasonable finder of
fact would find that DBTNC thereby lacked possession of the note
or lacked entitlement to enforce the note given the overwhelming
documentary evidence to the contrary.

      DBNTC next submits that it did not transfer the note to
Ocwen, its loan servicer, or Ablitt, its attorney, for the
purpose of giving them an independent right to enforce the note.
(Docket Entry # 64, pp. 6-7).  Further, DBNTC contends that
defendant was discharged of any personal liability on the note by
the bankruptcy court and any transfer was for the purpose of
prosecuting the foreclosure of the mortgage as opposed to

enforcing the note against defendant. (Docket Entry # 64, pp. 9-10).

Section 3-309(a)(ii) allows a person to enforce a lost instrument if "the loss of possession was not the result of a transfer by the person." Mass. Gen. Laws ch. 106, § 3-309(a). Under chapter 106, section 3-203 ("section 3-203"), "[a]n instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." Mass. Gen. Laws ch. 106, § 3-203(a); see In re Gavin, 319 B.R. at 31 ("instrument is 'transferred' when it is delivered by the holder for the purpose of giving the recipient the right to enforce the instrument").

As previously set out in this court's Memorandum and Order (Docket Entry # 41, pp. 39-41), to show DBNTC transferred the enforcement rights to either Ocwen or Ablitt, the record must show "first, that physical delivery of the Note was made [to that party], and second, that the intent of the transferor was to give [that] party 'the right to enforce the instrument.'" Zea v. JP Morgan Chase Bank, 2012 WL 996767, at *5 (D. Mass. Mar. 22, 2012) ("Zea"). Here, the summary judgment record establishes that DBNTC intended to give the note to Ocwen, as its agent, for a purpose other than enforcing the note by Ocwen for Ocwen's own behalf. Cf. In re Neals, 459 B.R. 612, 618 (Bankr.D.S.C. 2011);

28

In re Miller, 2014 WL 2860985, at *4 (Bankr.D.Vt. June 23, 2014)
(unpublished); see generally In re Montagne, 421 B.R. 65, 77
(Bankr.D.Vt. 2009).  For reasons fully explained in the prior
opinion, section 3-309 does not displace common law principles
of agency.  (Docket Entry # 41, pp. 30, 36-38).  Although
releasing or transferring a note with the intent of initiating
foreclosure proceedings would generally show that enforcement
rights have been transferred in accordance with Zea, "principles
of agency allow the foreclosing party to foreclose 'as the agent
of the note holder.'"  HMC Assets, LLC v. Conley, 2016 WL 4443152
at *49-50 (D. Mass. Aug. 22, 2016) ("HMC") (quoting Eaton v. Fed.
Nat'l Mortg. Ass'n, 969 N.E.2d at 1129 n.20, 1131 (Mass. 2012)).
The LPOA agreement between Ocwen and DBNTC gave Ocwen authority
"*in the Trustee's [DBNTC] name*, place and stead and *for the
Trustee's benefit* . . . for the purpose of performing such acts
and executing such documents *in the name of the Trustee* . . .."
Docket Entry # 65-13, p. 2) (emphasis added).  The lost note
affidavit submitted by Ocwen as servicer for DBNTC contains and
references records of transactional documents relating to
defendant's mortgage loan.  (Docket Entry # 65-20, pp. 5-25).
The lost note affidavit contains:  a copy of the note endorsed
in blank to New Century; the PSA agreement between Morgan
Stanley and DBNTC dated September 1, 2006; archived materials
showing that Ocwen received the collateral file containing the

note on November 3, 2011 and released the collateral file to Ablitt on November 21, 2011; the attorney bailee letter; and statements from an Ocwen employee that, despite diligent search efforts, the note has been lost. In light of the foregoing, DBNTC did not intend to give Ocwen and Ablitt independent enforcement rights in the note. The summary judgment facts provide insufficient evidence to establish a genuine dispute to the contrary. Adhering to principles of agency (Docket Entry # 41, pp. 28-38) and as evidenced by DBNTC's possession of the note before releasing it to Ocwen to act on behalf of DBNTC and thereafter to Ablitt, DBNTC's attorney, DBNTC was entitled to enforce the note when loss of the note occurred and DBNTC did not transfer independent enforcement rights to Ocwen, its servicer, or Ablitt, its attorney, as a matter of law.

   (2) <u>Possession When Loss of Note Occurred</u>

   DBNTC argues that it was still in possession of the note when its agent and attorney, Ablitt, lost the note. Citing this court's adjudication of defendant's motion to dismiss for failure to state a claim (Docket Entry # 11), DBNTC maintains it released the note to Ocwen, which then released the note to Ablitt in order to commence foreclosure proceedings against defendant on DBNTC's behalf.

   This court's analysis of two bankruptcy court cases in this district, <u>In re Harborhouse of Gloucester, LLC</u>, 505 B.R. at 373

("Desmond"), and Marks v. Braunstein, 439 B.R. 248, 251 (D. Mass. 2010) ("Marks"), as well as Dennis Joslin Co., LLC v. Robinson Broad. Corp., 977 F.Supp. 491, 495 (D.D.C. 1997) ("Joslin")), as applied to constructive possession of a promissory note need not be repeated at length.  (Docket Entry # 41, pp. 31-35).  As previously explained, Desmond, Marks, and Joslin are distinguishable because the parties seeking to enforce a lost note never had possession of the note at the required time, i.e., "when loss of possession occurred."  Mass. Gen. Laws ch. 106, § 3-309.  Here, DBNTC is the entity which had actual, physical possession of the note, gave the note to its agent (Ocwen), and Ocwen gave it to Ablitt (now CGAW), DBNTC's agent and attorney. Thus, "when loss of possession occurred" of the note, Mass. Gen. Laws ch. 106, § 3-309, DBNTC's agent had actual possession. DBNTC did not transfer ownership of the note to another entity but rather released the note to Ocwen with a limited power of attorney under the LPOA to conduct a foreclosure against defendant on DBNTC's behalf.  (Docket Entry # 65-13, p. 3).  As previously noted, the LPOA granted Ocwen the ability to carry out on behalf of DBNTC "the foreclosure, the taking of a deed in lieu of foreclosure, or the completion of judicial or non-judicial foreclosure or termination, cancellation or rescission of any such foreclosure . . .."  (Docket Entry # 65-13, p. 3).  In short, Ocwen, as agent, and Ablitt, as DBNTC's attorney, held the

note on behalf of DBNTC with DBNTC retaining enforcement rights associated with the note.

As previously explained in this court's Memorandum and Order (Docket Entry # 41, pp. 28-31), the provisions of section 3-309 do not displace the principles of agency.[12]  Likewise, the discussion of agency under Massachusetts common law is addressed in this court's previous Memorandum and Order (Docket Entry # 41, pp. 28-38) and, accordingly, need not be repeated.  Nothing in section 3-309 precludes an entity from enforcing a lost note when, at the time the loss occurred:  the entity had constructive possession, through its agent, of the note; was entitled to enforce the note at that time; and is now seeking to enforce it without having transferred or assigned the note to another person or entity downstream.  In such circumstances, the provisions of section 3-309 do not displace principles of agency.  Adhering to these principles, DBNTC possessed the note at the time of loss because DBNTC did not transfer its rights to enforce the note to Ocwen or Ablitt.  Simply stated, the loss of the note was not the result of a transfer by DBNTC.

Defendant, however, maintains that a genuine issue of material fact exists as to whether the note was lost.  Defendant argues that DBNTC fails to satisfy section 3-309(a)(iii) because

---

[12]  It is therefore not necessary to repeat the analysis here.

DBNTC is unable to show that it cannot reasonably obtain possession of the note.  Defendant reasons that because DBNTC stated in the complaint that Durham took possession of Ablitt's assets in 2014 and had control over promissory notes, Durham might still have possession of the note.  Defendant also references the factoring agreement between Ablitt and Durham and the bankruptcy docket of the CGAW bankruptcy proceeding to suggest that Durham had possession of promissory notes and other papers associated with some of Ablitt's accounts.

Section 3-309(a) provides that, "A person not in possession of an instrument is entitled to enforce the instrument if . . . the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person . . .."  Mass. Gen. Laws ch. 106, § 3-309(a)(iii).  The lost note affidavit establishes that, prior to executing the lost note affidavit, Ocwen undertook a diligent search for the original note on April 1, 2016.  (Docket Entry # 65-20, ¶ 6).  The search did not establish location of the note, leading an Ocwen employee to file a lost note affidavit on September 12, 2016 because DBNTC could not reasonably obtain possession of the note.  (Docket Entry # 65-20, ¶¶ 1, 6).  According to the note possession history, Ocwen released the original collateral file containing the note to Ablitt on November 21, 2011.  (Docket

33

Entry # 65-17).  Ablitt did not return the original note and its location cannot be determined.  (Docket Entry # 65-17).  DBNTC therefore establishes that it "cannot reasonably obtain possession."  Mass. Gen. Laws ch. 106, § 3-309(a)(iii).

It is true that DBNTC, in its complaint, stated that Durham had control over defendant's note.[13]  (Docket Entry # 1, ¶¶ 35-36).  In addition, the factoring agreement between Ablitt and Durham granted Durham a security interest in Ablitt's accounts and promissory notes.  (Docket Entry # 73-1, pp. 22, 25).  First, however, Ablitt, DBNTC's attorney, did not own the note.  Rather, it only held the note on behalf of DBNTC.

Second, "a diligent search for the [n]ote was conducted" on April 1, 2016.  (Docket Entry # 65-20, ¶ 6).  The "[n]ote could not be located."  (Docket Entry # 65-20, ¶ 6).  Moreover, the note possession history tracks:  the original note, including the release of the collateral file to Ocwen; Ocwen's delivery of the note to Ablitt, DBNTC's attorney; and the inability to determine the current location of the original note.  (Docket Entry # 65-17).  Here again, in light of the foregoing, DBNTC

_____

[13]  Defendant seeks to use the above statement as part of the summary judgment record.  (Docket Entry # 73, pp. 8-10).  For the purposes of reviewing a motion for summary judgment, "'A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.'"  Schott Motorcycle Supply, Inc. v. American Honda Motor Co., 976 F.2d at 61 (quoting Bellefonte Re Insurance Co. v. Argonaut Insurance Co., 757 F.2d 523, 528 (2d Cir. 1985)).

"cannot reasonably obtain possession of the note."  Mass. Gen.
Laws ch. 106, § 3-309(a)(iii).

Defendant's reliance on Ocwen's renewed motion for an order
of contempt against Durham in August 2015[14] and the factoring
agreement to suggest that Durham had possession of promissory
notes and other papers associated with some of Ablitt's accounts
is misplaced.  It was the following year that Ocwen executed the
lost note affidavit.  (Docket Entry # 65-20).  The lost note
affidavit states that a diligent search for the note took place
but the note could not be located.  (Docket Entry # 65-20, ¶ 6).
The note possession history provides that DBNTC received the
collateral file with the original note on May 12, 2016 and,
through principles of agency, had possession of the note at the
time of loss.  As discussed further infra, the lost note
affidavit also indemnifies defendant against any loss that might
occur through any other claims against the property.  (Docket
Entry # 65-20, ¶ 10).  DBNTC thus established that it cannot
reasonably find the note and, even if the note is later found in
Durham's possession, DBNTC will indemnify defendant against any
loss.  As discussed previously, DBNTC released the note for
foreclosure proceeding purposes only to its servicer and

---

[14]  Ordinarily, an assertion in a motion or brief does not
constitute a fact for purposes of summary judgment.  See Kelly
v. United States, 924 F.2d 355, 357 (1st Cir. 1991).

thereafter its attorney to act on behalf of DBNTC.  For reasons also set out by DBNTC (Docket Entry # 76, pp. 8-9), defendant's argument based on Durham's purported possession of the note does not create a genuinely disputed material fact that DBNTC cannot reasonably obtain possession of the note.  Rather, the summary judgment record establishes that DBNTC cannot reasonably obtain possession of the note as a matter of law.

### (3) Business Records Exception

Defendant submits that this court cannot consider Ocwen's business records as an exception to the hearsay rule under Fed.R.Evid. 803(6)(A) ("Rule 803(6)").  Defendant maintains that Ocwen's affidavits (Docket Entry ## 65-1, 65-20) are conclusory, do not sufficiently "explain the basis of the information used to make these records," and are not trustworthy.  (Docket Entry # 73, pp. 5-8) (capitalization omitted).  DBNTC asserts that its business records satisfy the exception because the affidavits are not conclusory, clearly state how the business records were made, and are trustworthy.  (Docket Entry # 76, pp. 4-9).

As stated in Rule 56(c)(4), "An affidavit or declaration used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on matters stated."  To fall within the reach of the business records exception, a party must show that,

"the record was made at or near the time by—or from information transmitted by—someone with knowledge."  Fed.R.Evid. 803(6)(A).

Defendant argues that both affidavits from Ocwen employees are inadmissible because Ocwen was not the servicer at the time defendant signed the promissory note and therefore employees of Ocwen did not have personal knowledge of how DBNTC acquired the note from New Century.  (Docket Entry # 73, pp. 6-7).  Defendant also argues that the affidavits are conclusory because Ocwen did not provide enough information about how it learned about the note possession history.  "An affiant," however, "is only required to have some familiarity and ability to explain how the business records were handled to satisfy Rule 803(6), especially when there is no indication for a lack of trustworthiness."  HMC Assets, LLC v. Conley, 2016 WL 4443152 at *16 (citing Wallace Motor Sales, Inc. v. American Motors Sales Corp., 780 F.2d 1049, 1061 (1st Cir. 1985) ("Wallace")).  Furthermore, "As for the requirement that the record-keeping process be attested to by a qualified witness, it is well established that the witness need not be the person who actually prepared the record."  Wallace Motor Sales, Inc. v. American Motors Sales Corp., 780 F.2d at 1061.  Moreover, the business records exception "'does not require testimony by some witness associated with the predecessor entity when the records become part of the records of a successor entity.'"  HMC Assets, LLC v. Conley, 2016 WL 4443152 at *7.

Here, the lost note affidavit and the Ocwen employee
affidavit both attest to the personal knowledge and
qualifications of the affiants in their regular job duties.  Both
affidavits state that the records were made at or near the time
by persons with knowledge of the transaction or activity
reflected in the particular record.  The records were also kept
in the normal course of business.  (Docket Entry # 65-1, ¶ 2)
(Docket Entry # 65-20, ¶ 2).  In addition, the lost note
affidavit contains the actual records submitted as exhibits from
which the Ocwen employee bases his personal knowledge.  Ocwen
acted as the servicer for DBNTC and therefore would have handled
DBNTC's business records in addition to using this information to
create its own records.  These affidavits are not conclusory or
allegations based on unfounded beliefs of the affiants because
Ocwen's employees in the course of their job duties reviewed the
loan servicing history to make the informed statements of fact.
Although the affiants would not themselves have prepared the
original records upon which they rely, Wallace allows these
employees to be qualified witnesses under the circumstances at
issue here.  In addition, because Rule 803(6) allows employees of
successor entities, which have incorporated a previous entity's
business records into their own, to provide testimony about those
records, Phillips v. Mortg. Elec. Registration Systems, Inc.,
2013 WL 1498956, *3 (N.D.Ala. Apr. 5, 2013), both affidavits from

Ocwen employees are permissible.

Defendant also maintains that both affidavits lack trustworthiness and are therefore inadmissible.  Defendant asserts that Ocwen cannot prove that the referenced note in both affidavits was the original note signed by defendant and the records relied upon are unidentified and undocumented.  Under the business records exception, the court may refuse to admit records unless, "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  Fed.R.Evid. 803(6)(E). "The determination of whether a foundation has been properly laid for application of Federal Rules of Evidence 803(6) and whether the circumstances indicate lack of trustworthiness is within the discretion of the district court."  United States v. Patterson, 644 F.2d 890, 900-01 (1st Cir. 1981).  Defendant relies on Gavin to assert that DBNTC would have to provide a direct source of where, when, and how it acquired defendant's note which "establishes the terms of the loan, ownership of the loan, and adequate protection that the Debtor will not sustain a loss from another party claiming to own the Note."  In Re Gavin, 319 B.R. at 32-33.  The court in Gavin held that, although Premier showed evidence of an assignment of a promissory note from a previous creditor, Sovereign, to Premier and produced the original note from the first creditor in the chain of title,

Fleet, Premier did not present sufficient evidence showing an assignment of the note from Fleet to Sovereign. <u>Id.</u> The court further reasoned that Premier's argument for using a reasonable inference from the circumstantial evidence presented to circumvent the break in the chain of title was unwarranted because direct evidence was needed. <u>Id.</u>

"Mere possession of a note payable to another does not suffice to show ownership." <u>NCNB Texas Nat. Bank v. Johnson</u>, 11 F.3d 1260, 1265 (5th Cir. 1994). "It is also true that, standing alone, a purchase agreement covering unspecified assets does not establish ownership." <u>Id.</u> "Generally, however, the affidavit of a custodian of records is sufficient proof, unless the defendant points to evidence in the record supporting a legitimate fear that the plaintiff is not the owner and holder of the note, and that some other party will later appear and demand payment." <u>Id.</u> Ocwen, as custodian for DBNTC's mortgage files, has shown proof through its records that it was acting in a servicing capacity for DBNTC and that DBNTC held the original note before releasing the note for foreclosure proceeding purposes. DBNTC further proves, for reasons that will be explained below, that defendant's chapter seven bankruptcy discharge protects against multiple claims of the note by any other third party. The indemnity provision in the lost note affidavit provides additional protection.

(4) <u>Enforcement of Note under Section 3-309(b)</u>

DBNTC contends that it not only possessed the note and was entitled to enforce the note at the time it was lost, but that it also satisfies the provisions of section 3-309(b). As stated above:

> The court may not enter judgment in favor of the person seeking enforcement unless it finds that the person required to pay the instrument is adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument. Adequate protection may be provided by any reasonable means.

Mass. Gen. Laws ch. 106, § 3-309(b).

As explained by the court in <u>Gavin</u>, a creditor must demonstrate that there is "adequate protection that the Debtor will not sustain a loss from another party claiming to own the Note." <u>In re Gavin</u>, 319 B.R. at 33. Here, DBNTC established that defendant is adequately protected against multiple claims in light of defendant's chapter seven bankruptcy discharge. A discharge order "operates as an injunction against the commencement or continuation of an action . . . to collect, recover, or offset any such debt as a personal liability of the debtor . . . ." 11 U.S.C. § 524(a)(2). "Even after the debtor's personal obligations have been extinguished, the mortgage holder still retains a 'right to payment' in the form of its right to the proceeds from the sale of the debtor's property." <u>Johnson v. Home State Bank</u>, 501 U.S. 78, 84 (1991); <u>see</u> <u>also</u> <u>Arruda v.</u>

41

Sears, Roebuck & Co., 310 F.3d 13, 21 (1st Cir. 2002). DBNTC
and all other parties cannot pursue a cause of action against
defendant for the note amount because of the bankruptcy
discharge, but the discharge does allow DBNTC to institute a
foreclosure proceeding against the property. See Johnson v.
Home State Bank, 501 U.S. at 84. Furthermore, DBNTC agreed to
indemnify defendant against any loss that might occur through
multiple conflicting claims against the property. (Docket Entry
# 65-20, ¶ 10). Accordingly, because defendant is adequately
protected against any possible loss by claims from other
parties, DBNTC satisfied the provisions of section 3-309(b).
Because DBNTC satisfied the requirements of sections 3-301 and 3-
309, summary judgment vis-à-vis the declaratory relief in counts
one and two is warranted in DBNTC's favor.[15] As requested in
Count One, DBNTC is the lawful owner of the note and is entitled
to immediate physical possession of the note. As requested in
Count Two, despite a diligent search, DBNTC has been unable to
find the original note; the terms of the note are set forth in
the copy of the note attached to the complaint; and DBNTC is a
party entitled to enforce the note under section 3-301(iii) and
the holder of the mortgage entitled to exercise the power of sale

---

[15] In light of the above, it is not necessary to address DBNTC's
alternative arguments for summary judgment, namely, judicial
estoppel and collateral estoppel.

in the mortgage.

As a final matter, pursuant to Fed.R.C.P. 56(d), defendant requests an opportunity to delay adjudication of the summary judgment motion because he needs information from outstanding interrogatories served on DBNTC on March 13, 2017. (Docket Entry # 73, p. 10). The interrogatories seek information concerning DBNTC's physical possession of the note and efforts it made to locate the note from Ablitt and Durham. (Docket Entry # 73-3). In an April 14, 2017 reply brief, DBNTC represents that it responded to the interrogatories. In the months following this representation, defendant has not filed a motion to compel or disputed DBNTC's representation by seeking leave to file a sur-reply. The request is therefore denied as moot.

CONCLUSION

In accordance with the foregoing discussion, the motion for summary judgment (Docket Entry # 63) is **ALLOWED** as to counts one and two. DBNTC is directed to file a proposed final judgment within seven days of the date of this opinion.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge